STATE OF NORTH CAROLINA v. ROBERT McLEAN, JR.

No. 33

(Filed 17 April 1978)

1. **Criminal Law § 75.9— statements made to police officer—volunteered statements**

   Statements made by defendant to a police officer were not the result of custodial interrogation and therefore inadmissible because they were made without benefit of *Miranda* warnings where the evidence tended to show that defendant was in jail for an unrelated charge when he made the statements in question; the officer walked into the room where defendant was and placed in defendant's view a work pad and a check belonging to defendant which had been found at the crime scene; the officer had in his pocket the arrest warrant charging defendant with rape; the officer said nothing; defendant took the check, looked at it and said it was his; defendant then observed a cap which had been found at the crime scene in the officer's hands; defendant began to act nervous, his hand began to quiver, and he said, "What's that man?"; the officer continued to remain silent; and as the officer started to leave the room, defendant stated, "I liked to have been a free man."

2. **Constitutional Law § 30; Bills of Discovery § 6— motion to inspect pretrial written statement denied—no in camera inspection—no error**

   Where a rape victim gave the prosecuting attorney a handwritten statement several days after she was assaulted, and she made mention of this statement during the course of her cross-examination, the trial court erred in denying defendant's request to inspect the statement without first conducting an *in camera* inspection and making findings of fact; however, such error was not prejudicial to defendant since (1) the statement was only weakly favorable and material to the defense in that the victim testified that she was knocked unconscious when defendant forced her to the ground but the statement made no mention of unconsciousness, and (2) the statement did not create a reasonable doubt as to defendant's guilt.

3. **Criminal Law § 88.2; Rape § 4.3— victim's environment of sexual promiscuity—cross-examination improper**

   In a rape prosecution where defense counsel asked the victim whether the persons who responded when she banged on the door of her apartment after she had been assaulted were wearing any clothes, the trial court did not err in instructing defense counsel that such questioning was improper, since that which the defense sought to establish—that the victim lived in an "environment of sexual immorality and promiscuity"—was irrelevant in this case where defendant denied that any act of intercourse or other assault took place, and since the court's instruction did not significantly deprive defendant of the opportunity to test the victim's recollection of the events which transpired on the evening she was assaulted.

**4. Rape § 5— second degree rape—sufficiency of evidence**

Evidence was sufficient to support a verdict of guilty of second degree rape where it tended to show that defendant followed the victim to her apartment parking lot where they had a discussion concerning the victim's hitting of defendant's car; defendant knocked the victim to the ground and had intercourse with her against her will; and items belonging to defendant were subsequently found at the crime scene.

**5. Criminal Law § 86.2— prior offense—question asked in good faith—presumption**

Where the record in a rape case contained no information from which it could be determined whether questions concerning a prior offense of defendant involving tampering with an automobile occupied by a female were asked in good faith, it is presumed that the action of the trial court in permitting the questions was correct, but even if any error was committed in this respect, it was entirely harmless, since defendant was afforded an opportunity to explain the circumstances surrounding his arrest and conviction, and defendant was entitled, on request, to an instruction that the jury should consider evidence of prior crimes or acts of misconduct only for the purpose of determining the weight to be given defendant's testimony.

**6. Criminal Law § 162— improper question—jury instructed to disregard**

The trial court did not abuse its discretion in denying defendant's motion for mistrial made after the prosecutor, in his cross-examination of defendant, asked if defendant had been discharged from the Army for psychiatric reasons, since defendant's objection to the question was sustained and the jury was instructed to disregard the question.

Justice EXUM dissenting.

DEFENDANT appeals from judgment of *McConnell, J.,* 29 August 1977 Regular Session, WAKE Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging him with the second degree rape of Gwen Denise Walker, age twenty, on 30 April 1977 in Wake County.

Gwen Denise Walker testified that she was a student at North Carolina State University in Raleigh and resided with Mary Dupree, Dougie Brown and Mary Yohe in a ground-floor apartment at 1832 Wilshire Avenue off Oberlin Road.

After eating with her friend Karen Atwood at Crabtree Valley Mall on 30 April 1977, she and Karen stopped at a grocery store and picked up a six-pack of beer. She then left Karen at the College Inn on Western Boulevard and stopped at Jimmy Bain's,

State v. McLean

a local tavern, where she remained until approximately 1 a.m. While there she drank one beer and talked to several friends.

Leaving Jimmy Bain's Tavern about 1 a.m. in Karen's car, she traveled down Hillsborough Street and turned into Oberlin Road, at which time she heard a noise as if the car had hit the curbing. She proceeded down Oberlin and at Clark Avenue heard a car engine accelerating behind her. That car continued to follow her. She turned into Wilshire and then into the driveway at the apartment house where she lived and parked in back of the apartments. At that point the car which had been following her pulled into the parking lot and stopped between the parked cars and the apartment building. A black man, identified by Miss Walker as defendant Robert McLean, Jr., got out of the car and accused her of hitting his car. Miss Walker examined a little dent on defendant's car, denied she hit his vehicle and said the dent did not look like a car had caused it. Defendant stated he was going to make her pay for hitting his car. He then grabbed her, knocked her against a parked car and threw her to the ground, leaving her addled and her vision blurred. "The next thing I knew when I looked up he was inside of me. . . . He was having intercourse with me. I was fighting and told him to please not do that. I did not actually recall him removing my pants or panties. I was just crying and the next thing I knew, I was crying real loud. Eventually, he stopped, got up and hurried off."

Miss Walker heard the car start and pull off rapidly. In a few seconds she arose, tried to adjust her pants, walked to her apartment, banged on the door and it was opened by Mary Dupree. In a few moments Dougie Brown and her boyfriend James Calloway came to the door. She told all of them she had been raped by a black man. She was crying and at times hysterical.

Dougie Brown and James Calloway testified that Miss Walker, when admitted to the apartment that night, was very ruffled and her hair was matted—"It had grass and leaves in it. She had mascara smeared all over her face where she had been crying and she was still crying. Her pants were unzipped and her belt was unbuckled. There were leaves and pine needles on her clothes."

Around 8 a.m. on the same morning James Calloway found in the parking lot behind the apartment building where Miss Walker

said she had been raped, a driver's license and a checkbook (State's Exhibits 11 and 12), both containing the name "Robert McLean, Jr.," and a cap (State's Exhibit 10).

Miss Walker did not report the rape to the police and told her friends to keep silent. She became so emotionally upset however that on 4 May 1977 she called her sister Mrs. Patrice Solberg, an attorney in Chapel Hill, and said she needed to confer with her. The Solbergs took her to their home in Chapel Hill where she stayed through 11 May. Miss Walker delivered the cap, the checkbook and the driver's license to them and told them what had occurred. At their insistence she went with them to the police on 5 May 1977 and told Detective J. C. Holder what had occurred. At that time they delivered to Officer Holder a paperbag containing the cap, checkbook and driver's license. On 10 May 1977 Detective Holder obtained a warrant charging defendant with the rape of Miss Walker.

Sometime between 30 April and 13 May, 1977, defendant was arrested and placed in jail for tampering with an automobile, an offense entirely unrelated to this case. At about 7:55 a.m. on 13 May, Detective Holder went to the jail. He had in his pocket at the time the arrest warrant charging defendant with rape. Officer Holder walked into the room carrying in his hand a work pad and a check which was found at the scene of the rape in the rear parking lot of 1832 Wilshire Avenue. He also had the cap found at the scene. The check had the name "Robert McLean, Jr." on it and was on top of the work pad in plain view. Officer Holder did not speak. He placed his work pad and the check on top of a desk in plain view of defendant but said nothing. Defendant reached over, looked at the check, took hold of it and said, "This is my check. I wrote this check when I did not know how to write checks. However, the check is good." Officer Holder said nothing. When defendant observed the cap he looked at Officer Holder, began to act nervous, his hand began to quiver, and he said, "What's that man?" Officer Holder said nothing. A few seconds passed and the officer lit a cigarette. Defendant asked for a cigarette and the officer gave him one. In the words of Officer Holder: "Few more seconds passed as we were smoking the cigarettes and before I started to leave the room he stated 'I liked to have been a free man.'" Shortly thereafter, at 8:15 a.m., Officer Holder read the warrant charging defendant with rape and advised defendant of

his constitutional rights. Defendant refused to sign a waiver. No interrogation thereafter took place.

Defendant challenged the competency of the foregoing testimony of Officer Holder. Upon a voir dire in the absence of the jury the State examined Officer Holder. Defendant offered no evidence on voir dire. The trial judge found as fact that defendant's statements were volunteered and were not in response to any *in-custody interrogation.* The court accordingly held that defendant's statements in the presence of Officer Holder were admissible in evidence.

Defendant testified before the jury as a witness in his own behalf. He said that on 30 April 1977 at about 12:45 a.m. he was driving his car down Oberlin Road, slowed down for a traffic signal, and Miss Gwen Walker, the State's witness, came up behind him in her car and struck his bumper. He stopped his car and thought at first that it was two fellows in the car that struck him. The car backed up and took off, hit a pole and kept going. He followed it thinking there were two men in the car. As the fleeing car pulled into the parking lot described by Miss Walker, he pulled in behind it and saw a blond-headed man jump out of it and ran away. An argument ensued between him and Miss Walker in which she denied striking his car, denied that any damage had been done and was concerned that she had hit a pole with her friend's car. Defendant said he got a tablet out of his car from which he took a white sheet of paper on which he wrote Miss Walker's name, license number and telephone number. He said she would not show her driver's license but spelled out her name for him and he wrote it down. He could tell she had been drinking because he smelled a heavy odor of alcohol on her breath and noticed Schlitz and Miller beer containers in her car. He emphatically denied that he knocked Miss Walker down or threatened her or assaulted her. He said: "I did not rape her. I did not have intercourse with her. When I left she looked normal but her eyes were a little red from regurgitating."

Defendant recalled that at one point he took out his driver's license and checkbook and thought he put them back in his pocket. He recognized the driver's license, the checkbook and check No. 110 (State's Exhibits, 11, 12 and 13) as his property but said he must have lost them the night of 30 April. He did not recognize the hat (State's Exhibit 10) and said it did not belong to

him. He did not know the whereabouts of the piece of paper on which he wrote Miss Walker's name and the other information—"I put it in my checkbook when I was behind the apartment house." He said when Officer Holder showed him the check he thought he had written a bad check and that the officer was bringing a bad check charge against him.

The jury returned a verdict of guilty of second degree rape as charged, and defendant was sentenced to life imprisonment. His appeal presents for determination the assignments of error discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Rudolph A. Ashton III, Associate Attorney, for the State.*

*Thomas P. McNamara, attorney for defendant appellant.*

HUSKINS, Justice.

[1]  By his first assignment of error defendant contends the trial court improperly admitted into evidence the statements defendant made to Detective Holder. Defendant argues that at the time these statements were made he had not been given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), and accordingly the statements are inadmissible under *Miranda* rules.

*Miranda* held inadmissible only those statements made in response to "custodial interrogation" and not preceded by the requisite warnings. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 16 L.Ed. 2d at 706, 86 S.Ct. at 1612 (footnote omitted). The Supreme Court emphasized that only statements elicited by interrogation were affected by its holding: "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 16 L.Ed 2d at 726, 86 S.Ct. at 1630. Accordingly, the question presented for review is whether Detective Holder's conduct constitutes "interrogation."

Cases from other jurisdictions disclose a notable lack of consensus concerning what conduct constitutes interrogation. It has been held that officers may read a ballistics report to an accused (*Combs v. Commonwealth*, 438 S.W. 2d 82 (Ky. 1969)), escort an accused to a confrontation with a codefendant (*People v. Doss*, 44 Ill. 2d 541, 256 N.E. 2d 753 (1970); *see also Rosher v. State*, 319 So. 2d 150 (Fla. App. 1975)), tell a defendant what statements have been made by a codefendant (*Howell v. State*, 5 Md. App. 337, 247 A. 2d 291 (1968)), or ask a defendant about the origin of marijuana found in his car (*Santos v. Bayley*, 400 F. Supp. 784 (M.D. Pa. 1975)) without being engaged in interrogation within the meaning of *Miranda*. Other courts have shown less hesitancy in finding officers' condut to be interrogatory in nature. *See, e.g., People v. Paulin*, 33 App. Div. 2d 105, 308 N.Y.S. 2d 883 (1969) (query concerning funeral arrangements is interrogation); *Commonwealth v. Mercier*, 451 Pa. 211, 302 A. 2d 337 (1973) (reading statement of codefendant to accused is interrogation). The United States Supreme Court has likewise had difficulty in determining what is meant by "interrogation." In *Brewer v. Williams*, 430 U.S. 387, 51 L.Ed. 2d 424, 97 S.Ct. 1232 (1977), that Court held that an officer's declaratory statements to defendant in absence of his counsel, avowedly made for the purpose of eliciting information from him, constituted interrogation. Justice Blackmun, in a dissent joined by Justices White and Rehnquist, contended otherwise, stating "not every attempt to elicit information should be regarded as 'tantamount to interrogation.' " 430 U.S. at 439, 51 L.Ed. 2d at 462, 97 S.Ct. at 1260.

Given such widespread disagreement, we formulate no all-inclusive definition of "custodial interrogation." Rather, we elect to follow the case-by-case approach advocated by some of the federal courts. See *United States v. Akin*, 435 F. 2d 1011 (5th Cir. 1970); *United States v. Charles*, 371 F. Supp. 204 (E.D.N.Y. 1973) (each discussing whether defendant was in custody and hence had been subjected to custodial interrogation).

Under the facts of the present case we hold that Detective Holder was not engaged in interrogation when defendant made the statements which were subsequently offered in evidence against him. Holder did not ask questions or engage in conduct which, in our view, is inquisitional in nature. *See State v. Burton*, 22 N.C. App. 559, 207 S.E. 2d 344, *cert. denied* 286 N.C. 212 (1974).

*See also People v. Leffew*, 58 Mich. App. 533, 228 N.W. 2d 449 (1975). Accordingly, the trial court's findings and conclusions that defendant's statements were volunteered and therefore admissible were correct. *See State v. Stepney*, 280 N.C. 306, 185 S.E. 2d 844 (1972). In so deciding, however, we explicitly recognize that future cases may disclose acts or declarations, or both, which constitute "custodial interrogation" although no questions were asked. Defendant's first assignment of error is overruled.

[2] By his second assignment of error defendant contends the trial court erred in denying his request to examine the rape victim's handwritten statement made several days after she was assaulted. This statement had been given to the prosecuting attorney by Miss Walker, and she made mention of it during the course of her cross-examination. Defense counsel then specifically requested permission to inspect the statement. This request was denied. The trial court conducted no *in camera* inspection of the statement and made no findings of fact relating to the denial of defendant's request.

In *State v. Hardy*, 293 N.C. 105 at 127-28, 235 S.E. 2d 828 at 842 (1977), we held that "justice requires the judge to order an *in camera* inspection when a specific request is made at trial for disclosure of evidence in the State's possession that is obviously relevant, competent and not privileged." If the court then determines that such evidence is material and favorable to the defense, it must order that it be disclosed to defense counsel. As noted in the *Hardy* opinion, "The relevancy for impeachment purposes of a prior statement of a material State's witness is obvious." *Id.* Accordingly, it was error for the trial court to deny summarily defendant's specific request for the prior written statement of State's witness Gwen Walker.

While defendant failed to move at trial that a sealed transcript of Miss Walker's statement be placed in the record for appellate review, prosecution and defense counsel did enter into a stipulation that the statement be made a part of the record on appeal. Accordingly, we now consider and determine whether the court's refusal to permit defense counsel to examine this statement at trial constitutes prejudicial error. *Compare State v. Hardy, supra*, at 128, 235 S.E. 2d at 842. In order to resolve this issue, we must address two questions. First, was Miss Walker's prior statement *favorable and material* to the defense? If so, the

trial court should have ordered that the statement be disclosed. If not, the trial court committed no prejudicial error, although the procedure followed by Judge McConnell was improper under the *Hardy* rule. Second, was the prior statement sufficiently favorable to the accused that it created "a reasonable doubt that did not otherwise exist" as to the guilt of the accused? *United States v. Agurs*, 427 U.S. 97, 112, 49 L.Ed. 2d 342, 355, 96 S.Ct. 2392, 2401 (1976). If the undisclosed statement does not create such a doubt, the error arising from its nondisclosure is harmless and does not necessitate a new trial. *Id.*

We are persuaded that Miss Walker's prior statement is weakly "favorable and material" to the defense in that she testified on cross-examination that she was knocked unconscious when defendant forced her to the ground but her prior written statement made no mention of unconsciousness. This discrepancy might have been exploited by defense counsel to question the accuracy of her recollection concerning her version of other events which transpired on the evening she was assaulted. The trial court, therefore, should have granted defendant's request to inspect the statement. Even so, the content of the statement falls woefully short of creating a reasonable doubt as to defendant's guilt. It corroborates Miss Walker's testimony in almost every respect and discloses nothing which calls into question her veracity or casts significant doubt on the accuracy of her testimony at trial. Under the harmless error standard set forth in *Agurs*, or any other standard for harmless error (*see, e.g., Fahy v. Connecticut*, 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963)), Judge McConnell's error in refusing to order this statement disclosed to defense counsel is harmless and does not warrant a new trial. Accordingly, defendant's second assignment of error is overruled.

[3] During cross-examination of Miss Walker defense counsel asked whether the persons who responded when she banged on the door of her apartment after she had been assaulted were wearing any clothes. The trial court thereupon, on its own motion, excused the jury and instructed defense counsel that it regarded this question as an attempt to attack the character of Miss Walker's housemates by innuendo, and that such questioning was improper. Defendant's exception to this ruling constitutes his third assignment of error. He contends the trial court's ruling

improperly curtailed his right to develop facts relating to "the environment of sexual immorality and promiscuity in which the prosecutrix voluntarily chose to live" and precluded him from testing her recollection of events which transpired on the evening she was assaulted.

In this jurisdiction cross-examination may concern any subject which is relevant to the issues in the case. *State v. Huskins*, 209 N.C. 727, 184 S.E. 480 (1936). The cross-examination must, however, concern *relevant* matters. *Yadkin Valley Motor Co. v. Ins. Co.*, 220 N.C. 168, 16 S.E. 2d 847 (1941). And determination of the proper limit of cross-examination rests largely in the discretion of the trial judge. *See, e.g., State v. Chance*, 279 N.C. 643, 185 S.E. 2d 227 (1971).

Whether Miss Walker lived in an "environment of sexual immorality" or in a cloistered convent has no relevance to the issues in a case such as this where defendant denies that any act of intercourse or other assault took place. *See, e.g., People v. Schafer*, 4 Cal. App. 3d 554, 84 Cal. Rptr. 464 (1970). (*See also* G.S. 8-58.6, not effective at the time of the assault on Miss Walker, which in future rape prosecutions will restrict the admissibility of evidence relating to a complainant's sexual behavior.) Furthermore, examinaton of the record shows that Judge McConnell only instructed defense counsel to avoid questions which attacked, by innuendo, the character of prospective prosecution witnesses. Such instruction did not significantly deprive defendant of the opportunity to test Miss Walker's recollection of the events which transpired on the evening she was assaulted. Under these circumstances we are of the opinion that Judge McConnell's ruling constituted a proper exercise of his discretion. Defendant's third assignment of error is overruled.

[4] By his fourth assignment of error defendant contends the evidence adduced at trial was insufficient to support a verdict of guilty of second degree rape. He argues, therefore, that his motions for nonsuit, for a new trial, and to set aside the verdict should have been allowed.

When the evidence is considered in the light most favorable to the State, taken as true, and the State is given the benefit of every reasonable inference to be drawn therefrom (*see State v. Vincent*, 278 N.C. 63, 178 S.E. 2d 608 (1971)), it is abundantly suffi-

cient to carry the case to the jury and to support the verdict. The motion for nonsuit was properly denied.

Defendant's motions to set aside the verdict and for a new trial are merely formal and require no discussion. These motions are addressed to the discretion of the trial court and refusal to grant them is not reviewable. *State v. Downey*, 253 N.C. 348, 117 S.E. 2d 39 (1960). These motions were properly denied. Defendant's fourth assignment of error is overruled.

[5] The fifth assignment of error relates to the manner in which the prosecutor cross-examined defendant. During cross-examination defendant admitted that he had been convicted of tampering with an automobile. The private prosecutor then asked:

> "Mr. McLean, the car that you tampered with, was a 1973 Plymouth Duster, blue in color and it was occupied by a female person named Joann Ellis, and you were tampering with it by pulling and pushing upon the door handle and latch, weren't you sir?"

Defendant objected and assigns as error the court's action in overruling his objection and denying his motion to strike. In his brief defendant contends there was no basis in fact for the prosecutor's assertion that the car was occupied by a female when defendant tampered with it. He further contends that the prosecutor's question was improper and highly prejudicial "since the jury in a case of this type no doubt was concerned about whether defendant had been a threat to other women."

In this jurisdiction a witness, including the defendant in a criminal case, may be impeached on cross-examination by questions concerning his conviction of prior unrelated criminal offenses. *E.g., State v. Neal*, 222 N.C. 546, 23 S.E. 2d 911 (1943). *See generally* 1 Stansbury's North Carolina Evidence § 112 (Brandis rev. 1973). Further, a witness may be impeached by cross-examination as to whether he has committed specific criminal acts or engaged in specified reprehensible conduct. *E.g., State v. Gainey*, 280 N.C. 366, 185 S.Ed, 2d 874 (1972). *See generally* 1 Stansbury's North Carolina Evidence, supra, § 111, § 112 at n. 29. Both types of questions are proper only if based on information and asked in good faith. *State v. Williams*, 279 N.C. 663, 185 S.E.

2d 174 (1971); *State v. Bell*, 249 N.C. 379, 106 S.E. 2d 495 (1959). *Compare State v. Phillips*, 240 N.C. 516, 82 S.E. 2d 762 (1954).

On the record before us it is impossible to determine whether the prosecutor acted on information and in good faith when he asked if the auto, with which defendant had been convicted of tampering, was occupied by a female. We have held that when a record contains no information from which it can be determined whether questions concerning prior criminal offenses were asked in good faith, the action of the trial court in permitting the questions will be presumed correct. *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970). We hold here, however, that even if the question were not based on information and not asked in good faith, which is not conceded, the trial court's error in permitting the question would not be of sufficient moment to warrant a new trial.

Defendant was afforded an opportunity to explain the circumstances surrounding his arrest and conviction. Defense counsel was entitled to pursue the matter further on redirect examination. Defendant was entitled, on request, to an instruction that the jury should consider evidence of prior crimes or acts of misconduct *only* for the purpose of determining the weight to be given defendant's testimony. *State v. Norkett*, 269 N.C. 679, 153 S.E. 2d 362 (1967). Under the facts of this case these safeguards afforded defendant adequate opportunity to negate any likely prejudice flowing from the question, even assuming the prosecutor acted in bad faith when he asked about the presence of a woman in the car. Accordingly, we conclude that if any error was committed in this respect it was entirely harmless. Defendant's fifth assignment is overruled.

[6]  By his sixth assignment of error defendant contends the trial court erred in denying his motion for mistrial when the prosecutor, in his cross-examination of defendant, asked: "Mr. McLean you were discharged [from the Army] for psychiatric reasons, weren't you?" Defendant's objection was sustained and the jury instructed to disregard the question. Defendant's motion for mistrial was denied.

Motions for mistrial in non-capital cases are addressed to the discretion of the trial judge, and his ruling thereupon will not be disturbed absent a showing of gross abuse of discretion. *E.g.*,

*State v. Daye*, 281 N.C. 592, 189 S.E. 2d 481 (1972). No abuse of discretion exists on the present record, and defendant's sixth assignment of error is therefore overruled.

Finally, defendant contends that the cumulative effect of the asserted errors heretofore complained of deprived him of a fair trial. As previously noted, defendant's trial was not entirely error free. Even so, we hold that the errors committed were not so material that a different result would likely have ensued had defendant been afforded the perfect trial for which our system of justice strives but seldom attains. We think defendant had a fair trial free from prejudicial error. Accordingly, the verdict and judgment must be upheld.

No error.

Justice EXUM dissenting.

I respectfully dissent and vote for a new trial. I believe prejudicial error was committed (1) when defendant's statements made to Detective Holder were admitted into evidence against him; (2) when the trial court denied defendant's motion to be allowed to examine the prosecuting witness' pre-trial statements; and (3) by the prosecutor's improper cross-examination of defendant.

The conduct of Detective Holder when he confronted defendant in jail on 13 May 1977 with a warrant in his pocket for defendant's arrest on this rape charge was an attempt to circumvent the requirements of *Miranda*, as transparently obvious as it was clever. His conduct was palpably designed to elicit inculpatory information and clearly placed the accused, however subtly, under a compulsion to speak. As such it constituted "interrogation" within the meaning of *Miranda*.

There are many forms of interrogation known to police science other than asking direct questions. A number of them are mentioned in the majority opinion. For others see the lengthy discussion in *Miranda*, 384 U.S. at 448-57 and the authorities therein cited. The Supreme Court in *Miranda* considered that an "interrogation" occurred, giving rise to the accused's privilege against self-incrimination about which he was then required to be

advised, whenever the police placed the accused under a "compulsion to speak." The Supreme Court, addressing this question in *Miranda*, said, 384 U.S. at 460-61:

> "The question in these cases is whether the privilege is fully applicable during a period of custodial interrogation . . . .We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery."

"It is implicit in *Miranda* that interrogation in this context need not be of the question and answer type." *State v. Godfrey*, 131 N.J. Super. 168, 178, 329 A. 2d 75, 80 (1974); *accord, Commonwealth v. Mercier*, 451 Pa. 211, 302 A. 2d 337 (1973). In *Godfrey* the New Jersey Appellate Division found an "interrogation" had occurred when the officers merely confronted the accused with the fact that he had failed a lie detector test and accused him of lying. In *Mercier* the Pennsylvania Supreme Court found an "interrogation" when the police read to the accused the written statement of an accomplice implicating the accused in the crime. No questions were directed toward the accused. In *Commonwealth v. Hamilton*, 445 Pa. 292, 285 A. 2d 172 (1971) the Pennsylvania Supreme Court held that confronting the defendant with an accomplice who accused defendant of committing the crime amounted to an interrogation within the meaning of *Miranda*. The Court said, 445 Pa. at 297, 285 A. 2d at 175:

> "To sanction this technique without proper warnings would be to place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda* that a suspect in custody should be clearly advised of his rights before any attempt is made to induce him to speak."

N.C.]                    SPRING TERM 1978                    637

In the celebrated case of *Brewer v. Williams*, 430 U.S. 387 (1977), the Supreme Court and all the lower state and federal courts which considered the case (it having arrived at the Supreme Court from the State of Iowa via federal habeas corpus) concluded that a declaratory statement, made by an officer in the presence of a murder suspect about the appropriateness of giving the victim a decent burial, constituted a form of interrogation which absent a waiver of his rights rendered inadmissible information later obtained through the response of the accused to the statement.

The conduct of Detective Holder was no less calculated to place and no less in fact placed the accused under a compulsion to speak than the "declaratory statement" held to be interrogation by a majority of the Supreme Court in *Brewer v. Williams, supra.* I believe this conduct must, therefore, have been preceded by the *Miranda* warnings before defendant's responses could be admitted in evidence against him.

I am unable to say, furthermore, that the trial court's error in failing to permit defendant to examine the prosecuting witness' pre-trial statement was harmless. As the majority notes, there was a discrepancy between his statement and her trial testimony and "[t]his discrepancy might have been exploited by defense counsel to question the accuracy of her recollection concerning her version of other events which transpired on the evening she was assaulted." Had defendant had an opportunity to exploit this discrepancy on cross-examination, it may well have altered in favor of defendant the delicate balance already inherent in the case. The jury's resolution of this case depended on whether they believed, not necessarily that the prosecuting witness was raped, but whether she was raped *by this defendant.* Defendant admitted having a confrontation with the prosecuting witness concerning an automobile accident at the place where Miss Walker testified the rape occurred. He also claims to have smelled on her breath "the heavy odor of alcoholic beverages" and "reefer or marijuana smoke in her car." He said she vomited during their conversation. He also testified that he observed a tall blond man running from Miss Walker's car when he pulled into the parking lot where she had stopped and as he left her after their discussion he last saw her going through some bushes. Defendant's defense was, then, that he did not rape nor have any sexual en-

counter with Miss Walker and that, if she had been raped as her testimony and that of other corroborating witnesses tended to show, someone else must have done it. This being the nature of his defense, that Miss Walker had said in a pre-trial statement that she was unconscious at some point during her encounter with defendant, would seem to be a crucial fact the benefit of which was denied to defendant by the trial court's error in not ordering that the statement be disclosed.

I do not understand the test for harmless error under these circumstances to be whether or not the content of the undisclosed statement creates, in itself, a reasonable doubt as to defendant's guilt. The majority relies on *United States v. Agurs*, 427 U.S. 97 (1976), for this proposition. *Agurs*, however, applied this test to so-called exculpatory information which the government under the rule of *Brady v. Maryland*, 373 U.S. 83 (1963) might be required to disclose to a defendant even in the absence of defendant's request for such material. In *Agurs* the material not disclosed was the deceased's prior criminal record when the defense in a murder prosecution was self-defense. Noting the "incongruity" of the claim of self-defense in the first place and that the deceased's "prior record did not contradict any evidence offered by the prosecutor . . . and did not even arguably give rise to any inference of perjury," the Supreme Court held that "since after considering it [the prior record] in the context of the entire record the trial judge remained convinced of respondent's guilt beyond a reasonable doubt, and since we are satisfied that his firsthand appraisal of the record was thorough and entirely reasonable, we hold that the prosecutor's failure to tender Sewell's record to the defense did not deprive respondent of a fair trial . . . . " 427 U.S. at 113-14.

Here, of course, defendant specifically asked for the prior out-of-court statement and his request was denied, a denial which the majority concedes was error. Furthermore, the question would seem to be not whether the content of the statement itself creates a reasonable doubt as to defendant's guilt but whether through skillful use of the statement on cross-examination such a reasonable doubt could have been created. I am unable to say, on this record, that it could not have been.

I also believe that the cross-examination of defendant by the state was not in good faith, improper and highly prejudicial to

defendant. On cross-examination defendant readily admitted having been convicted of tampering with an automobile and having been placed in custody for that offense on 3 May. The following cross-examination then occurred:

> "Q. Mr. McLean, the car that you tampered with, was a 1973 Plymouth Duster, blue in color and it was occupied by a female person named Joann Ellis, and you were tampering with it by pulling and pushing upon the door handle and latch, weren't you sir?

> "MR. MCNAMARA: Objection, motion to strike.

> "COURT: Objection overruled, motion denied.

> EXCEPTION NO. 8

> "A. No sir.

> "Q. Sir, isn't that what you did?

> "A. No sir.

> "Q. That's what you pled guilty to wasn't it, sir?

> "A. No sir.

>      . . . .

> "Q. You pled not guilty and you were found guilty, is that right?

> "A. Yes sir.

>      . . . .

> "COURT: What is the charge?

> "Q. The charge that you were convicted of, that you did unlawfully and willfully, on the 7th day of April, 1977, tamper with a 1973 Plymouth Duster, blue in color, without consent of the owner, Joanne Ellis, and pulling upon the door handle and latch; what did you do on that occasion sir?

> "MR. MCNAMARA: Objection.

> "COURT: Objection overruled.

> EXCEPTION NO. 9

"A. On the occasion on that night I wasn't tampering with the car. I was getting out going to the building looking for the income tax place. I dropped my keys, the guard came out, accused me — I went to another building looking for the income tax place and then the guards came and thought I was breaking in the place; brought me to court. He called me a liar. Then he put me in jail for nothing.

"Q. Mr. McLean do you have any military service?

"A. Yes sir.

"Q. What kind of discharge do you have?

"A. Honorable, sir.

"Q. Mr. McLean you were discharged for psychiatric reasons weren't you?

"MR. MCNAMARA: Objection, motion to strike.

"COURT: Sustained, motion to strike allowed.

"MR. MCNAMARA: Could I approach the bench?

"COURT: You will not consider the question about his discharge from the Army for psychiatric reasons. Disregard that. Come down Mr. McLean, and we will take a recess. Ladies and gentlemen of the jury, ya'll can go out. Don't discuss the case among yourselves or allow anyone to discuss it with you. Come back in fifteen minutes."

JURORS LEAVE COURTROOM.

"MR. MCNAMARA: Your Honor, I would like to move for a mistrial based on that also. I think that's very prejudicial.

"COURT: Motion denied.

EXCEPTION NO. 11"

On oral argument the state conceded that the warrant charging defendant with tampering with a motor vehicle was couched in the language with which the prosecutor framed his question as it appears above immediately before defendant's Exception No. 9, and that the prosecutor was undoubtedly reading from the warrant. The prosecutor, however, earlier inserted the notion that the vehicle "was occupied by a female person named

Joann Ellis." There was nothing in the warrant to indicate that the vehicle was occupied at the time defendant was alleged to have tampered with it. He was not convicted of tampering with an *occupied* vehicle, as the prosecutor must have known. The record thus reveals that the earlier question was asked in bad faith.

We have, furthermore, recently held in *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977) that it is not improper on cross-examination to ask a defendant-witness who admits a prior conviction the time and place of the conviction and the punishment imposed. We cautioned however, 293 N.C. at 141, 235 S.E. 2d at 824:

> "Strong policy reasons support the principle that ordinarily one may not go into the details of the crime by which the witness is being impeached. Such details unduly distract the jury from the issues properly before it, harass the witness and inject confusion into the trial of the case."

It has also long been the rule with us that it is error warranting a new trial where the prosecutor "testifies" by injecting "into the trial of a cause to the prejudice of the accused by argument *or by insinuating questions* supposed facts of which there is no evidence." *State v. Phillips*, 240 N.C. 516, 524, 82 S.E. 2d 763, 767 (1954). (Emphasis supplied.)

The prosecutor here violated both of these principles when he asked whether in the automobile tampering case the car was not occupied by a female person. He violated the last mentioned principle when he asked whether defendant had been discharged from the army "for psychiatric reasons."

In a case such as this where the evidence is closely balanced and which involves a sexual assault upon a female person, these improper questions by the prosecutor bore too heavily to the prejudice of the defendant to be dismissed as harmless error or dealt with as a matter within the trial judge's discretion.