NO. COA14-158

NORTH CAROLINA COURT OF APPEALS

Filed: 7 October 2014

STATE OF NORTH CAROLINA

    v.                           Buncombe County
                                 No. 11 CRS 64716, 64719
JOHN BURTON EDMONDS, JR.
    Defendant.

_____

STATE OF NORTH CAROLINA

    v.

JAMES RYAN EDMONDS,
    Defendant.


Appeal by defendants from judgments entered 25 July 2013 by Judge James U. Downs in Buncombe County Superior Court. Heard in the Court of Appeals 27 August 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General Heather Freeman, for the State.*

> *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Paul M. Green, for defendant James Ryan Edmonds.*

> *Russell J. Hollers III, for defendant John B. Edmonds.*


ELMORE, Judge.


On 5 March 2012, the Buncombe County grand jury returned bills of indictment against defendant John Burton Edmonds, Jr.

("defendant John") for robbery with a dangerous weapon in 11 CRS 64719, and against his son, James Ryan Edmonds ("defendant James") for robbery with a dangerous weapon in 11 CRS 64716. On 18 April 2013, the State filed a Motion for Joinder, requesting that the trial court join the cases for trial. The motion was granted and the case came on for trial on 5 June 2013. The jury found both men guilty of robbery with a dangerous weapon. Defendant John admitted the aggravating factor that he committed the offense while on pretrial release, and he was sentenced to 97 to 129 months imprisonment with a 28-day credit. Defendant James also admitted that he committed the offense while on pretrial release. He was sentenced to 73 to 100 months imprisonment with a 10-day credit. Both defendant John and defendant James (collectively "defendants") now appeal their convictions. After careful consideration, we find that defendant John received a trial free from error and defendant James received a trial free from prejudicial error. However, we remand for a correction of clerical errors in defendant John's Judgment and Commitment form.

## I.    Background

At trial, the State called Leslie Pruitt, customer service manager at Forrest Hills Commercial Bank. Ms. Pruitt testified

that in September 2011, defendant John opened a bank account at Forrest Hills Commercial Bank that was funded by loan proceeds in the amount of $65,000.00. Ms. Pruitt testified that after this account was opened, large amounts of cash were withdrawn daily until the account was overdrawn. The bank's fraud detection system flagged the account as "a suspect of suspicious activity." Ms. Pruitt tracked the account activity and recommended it be closed. In November 2011, Forrest Hills Commercial Bank closed the account.

Anne Garrett, customer service representative at Forrest Hills Commercial Bank, testified that she was familiar with defendant John because he frequented the bank and called "all of the time" regarding his account. On 7 December 2011, one day before the robbery, defendant John and defendant James arrived together at the bank at 1:33 p.m. Ms. Garrett testified that the men approached her desk and defendant John took a seat. The surveillance video showed that defendant James stood to the side of Ms. Garrett's desk before moving behind it. Ms. Garrett testified that she particularly remembered defendant James that afternoon because he encroached on the personal space behind her desk.

On 8 December 2011, the day of the robbery, Ms. Garrett saw defendant John enter the bank on three separate occasions. At 11:00 a.m., defendant John first entered the bank and paced the lobby while talking on his cell phone. He did not speak to any bank employee. According to Ms. Garrett, it was customary for defendant John to be on his phone when he entered the bank. At 12:20 p.m., defendant John entered the bank once more. He adamantly asked bank personnel to open an account for him. He left after being informed that he could not open an account. Ms. Garrett testified that defendant John entered the bank for a third time at approximately 1:20 p.m. Defendant approached Ms. Garrett's desk, and she opened her cash drawer to put her work away. Defendant John took a seat despite the fact that Ms. Garrett was on the phone and there were other customer service representatives available to assist him. Shortly after defendant John sat down, Ms. Garrett testified that the bank door flung open and a masked man brandishing a gun ran directly to her with "no hesitation at all." The robber grabbed Ms. Garrett's cash drawer—forcing her hands off of it. He took the cash and ran out the door.

In a statement made to Detective Kevin Briggs after the robbery, Ms. Garrett noted that the robber wore a blue mask and

was about 5'7" tall. She also stated she believed the gun was fake because it had an orange cap. At trial, Ms. Garrett testified that she no longer thought the gun was fake. Ms. Garrett testified that the robber's build resembled defendant James'. She testified, "[a]s soon as everything happened and we closed the doors, I said that's [] John's son." Ms. Garrett also recognized that the robber wore the same shoes that defendant James had worn to the bank the previous day.

Sergeant Mark Allen with the Town of Biltmore Police Department testified on behalf of the State at trial. On 8 December 2011, Sergeant Allen responded to a bank robbery at Forest Hills Commercial Bank at approximately 1:22 p.m. As he approached the bank, defendant John was leaving. Sergeant Allen ordered him to stop. Defendant John informed Sergeant Allen that he was a patron of the bank and that it had just been robbed. Defendant John stated that he chased the robber out of the bank, that the robber was Hispanic, wore a black shirt and black mask, and fled across the parking lot into the wooded area behind the bank. Based on the information defendant John provided, Sergeant Allen set up a perimeter and radioed for a tracking K-9 unit.

After viewing the surveillance video of the robbery, Sergeant Allen named defendant John a suspect because (1) the direction defendant John said the robber fled did not match the video, (2) the robber's mask was not black, and (3) defendant John acted eager to leave the scene.

Jamie Johnson, defendant James' former girlfriend, testified for the State over defense counsels' objections. Jamie Johnson stated she and defendant James were living together in December 2011, at which time she was eight months pregnant with his child. Jamie Johnson testified that she drove a gold 2001 Mazda Tribute in December 2011, which defendant James frequently borrowed. This testimony was relevant because the bank's surveillance video from 8 December 2011 showed a gold Mazda Tribute pass defendant John in the bank's parking lot after the robbery. The same vehicle was shown on the surveillance video on 7 December 2011 after the men left the bank. Jamie Johnson alleged that defendant James frequently borrowed her vehicle and that he had done so on 8 December 2011.

On 7 December 2011 at 1:15 p.m., defendant James sent Jamie Johnson the following text message: "Jamie, if you want me to have money in the morning, I have have [sic] all the gas that's in your car to be able to do everything I have to, so if you run

any gas out we really will be f-----." Jamie Johnson alleged that on the evening of 8 December 2011, defendant James and defendant John arrived at her home with $2,000 cash and pills. Jamie Johnson admitted that she was addicted to oxycodone. Jamie Johnson also admitted that she threw defendant James' shoes into the river the following day per his request. Jamie Johnson also stated that defendant James kept a black Taurus revolver in his night stand.

Sergeant John Thomas of the Buncombe County Sheriff's Department testified that he obtained search warrants for defendant James, defendant John, and Jamie Johnson's cell phone records. The records evidence multiple calls between defendants on 8 December 2011, including calls originating at 1:17 p.m., 1:18 p.m., and 1:19 p.m., each utilizing cell towers near the bank. The surveillance video shows the robber entering the bank at 1:22 p.m. The next call between defendants occurred at 1:31 p.m. There were subsequent calls exchanged at 1:36 p.m., 1:46 p.m., 1:52 p.m., and 1:53 p.m.

Beau Dean, a network switch engineer for U.S. Cellular, testified for the State regarding defendants' cell phone usage on the requisite dates. His testimony corroborated Sergeant Thomas' in that defendants exchanged numerous calls on 8

December 2011 while utilizing cell towers in close proximity to the bank.

## II. <u>Analysis</u>

### A. <u>Objection to Jamie Johnson's testimony</u>

Defendant James argues that the trial court erred in overruling his objection to the hearsay testimony of Jamie Johnson. Specifically, defendant James argues that Jamie Johnson's testimony regarding alleged statements that Detective Briggs made to her constitutes inadmissible hearsay opinion testimony of a law enforcement officer regarding defendant James' guilt. We disagree.

"The North Carolina Rules of Evidence define 'hearsay' as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2013). "Out-of-court statements that are offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Gainey*, 355 N.C. 73, 87, 558 S.E.2d 463, 473 (2002). The erroneous admission of hearsay is not always so prejudicial as to require a new trial. *State v. Sills*, 311 N.C. 370, 378, 317 S.E.2d 379, 384 (1984).

At trial, Jamie Johnson testified on direct examination for the State as follows:

> Q. On December 9th of 2011, did Detective Briggs attempt to have an interview with you?
>
> A. I think that he came to my house. I think that's the day that he came to my house with my mother and his partner, and they told me that I should leave my house, that it probably wasn't safe and to come down—I think that he wanted me to come down to the station or somewhere and have an interview with him at that point, yeah. And I told him that I would rather wait.
>
> Q. You were nervous and upset, anxious at that time, right?
>
> A. Yes.
>
> Q. Didn't really want to talk to Detective Briggs; isn't that true?
>
> A. No. He had come into my house with my mom. I had told my mom what was going on with the bank robbery. And he called her and, I think, went to her house, and they rode together over to my house. **And he basically told me that [defendant James] robbed a bank, that it was for sure**; and that he had opened up my eyes to a very dangerous man.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Overruled.

Defendant James argues it was error for the trial court to overrule his objection to the admission of the above testimony,

particularly the statement made by Detective Briggs "that [defendant James] robbed a bank, that it was for sure[.]" Relying on *State v. Turnage*, 190 N.C. App. 123, 129, 660 S.E.2d 129, 133 (2008), defendant notes that law enforcement witnesses are prohibited from expressing an opinion as to defendant's guilt as that would impermissibly invade the province of the jury. Defendant James avers, "[b]y overruling [defendant's] proper objection to inadmissible evidence, the trial judge erroneously allowed the jury to consider, without limitation, the opinion of a Detective with twenty-two years of experience investigating major crimes[.]"

Defendant James is misguided. Here, it was Jamie Johnson, not Detective Briggs, who was testifying, and Detective Briggs did not advance his opinion as to defendant James' guilt. Nevertheless, on appeal defendant James cites cases, including, *inter alia*, *Turnage*, *supra, State v. White*, 154 N.C. App. 598, 572 S.E.2d 825 (2002), and *State v. Carrillo*, 164 N.C. App. 204, 595 S.E.2d 219 (2004), wherein our courts have held it is impermissible for a law enforcement officer to express an opinion as to a defendant's guilt. These cases are not applicable to the situation at bar.

We note that Jamie Johnson's testimony was not offered for the truth of the matter asserted—that Detective Briggs believed defendant James committed the robbery. Thus, Jamie Johnson's statement was admissible as it was merely offered to illustrate how Detective Briggs purportedly influenced her into making a statement in the case. Assuming *arguendo* that Jamie Johnson's testimony constituted inadmissible hearsay testimony, defendant James has likewise neglected to argue that he was in fact prejudiced by the admission of this testimony. *See State v. Hickey*, 317 N.C. 457, 473, 346 S.E.2d 646, 657 (1986) ("The defendant must still show that there was a reasonable possibility that a different result would have been reached at trial if the error had not been committed."). Defendant James' argument is overruled.

## B. <u>Mistrial</u>

Defendant James argues that "the trial court erred by allowing the State to put prejudicial hearsay before the jury by means of questions containing facts not in evidence." More specifically, the crux of defendant James' argument is best summarized as follows: defendant contends that the trial court erred in failing to declare a mistrial *ex mero motu* in response

to acts of prosecutorial misconduct during his trial. We disagree.

A trial court's decision not to intervene *ex mero motu* to declare a mistrial on the basis of a prosecutor's questions to a witness "will not be disturbed on appeal unless the trial court clearly has abused its discretion." *State v. Jaynes*, 342 N.C. 249, 280, 464 S.E.2d 448, 467 (1995). Where a prosecutor's questions are improper, the trial court has the authority to provide a curative instruction to the jury or to declare a mistrial. *See, e.g., State v. Norwood*, 344 N.C. 511, 537, 476 S.E.2d 349, 361 (1996). This is true even where, as here, the defendant never asked the trial court to declare a mistrial. *See Jaynes*, 342 N.C. at 280, 464 S.E.2d at 467 (considering whether there was error in the trial court's failure to declare a mistrial *ex mero motu* on the basis of alleged improper questions by the prosecutor despite the fact that the defendant made no motion for a mistrial).

Here, both defendants joined in a motion in limine prior to trial, each seeking to exclude "all testimony from Jamie Johnson relating to a gun being thrown in a river or her hearing a splash, [and] any mention of the gun in particular[.]" The

trial court denied the motion in limine.  The State questioned Jamie Johnson as follows:

> PROSECUTOR: State whether or not, Ms. Johnson, you and [Detective Briggs] were talking about a gun?
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Sustained.
>
> DEFENSE COUNSEL: Move to strike.
>
> THE COURT: Allowed.  Don't consider that, members of the jury, without any further foundation other than what you've got now.
>
> . . .
>
> PROSECUTOR: Did you tell [Detective Briggs] that you had heard the gun being thrown into the river?
>
> MR. SMITH [Attorney for Defendant John]: Objection.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: I can't hear you talking when you're walking with your back –
>
> PROSECUTOR: I'm sorry, Your Honor. The time that you were speaking to Detective Briggs, state whether or not you had told him you had heard a gun being thrown into the river.
>
> MR. SMITH: Objection.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Sustained.
>
> PROSECUTOR: So if Detective Briggs would

> have documented that through an audio conversation with you and him and then also now a transcription, which would be more correct about you hearing a gun being thrown in the river, what you're saying now or what you said then?
>
> MR. SMITH: Objection.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Sustained. It hasn't been established what she said then.

Defendant James contends that the State's line of questioning "appears to have been a deliberate tactic to inform the jury through questions what could not be proved through admissible evidence" and "[q]uestions that place inadmissible information before the jury are improper."

We disagree. The prosecutor did not place inadmissible information before the jury. Again, we note that defendants' motion in limine was denied. Our Supreme Court has held that "[q]uestions asked on cross-examination will be considered proper unless the record shows they were asked in bad faith." *State v. Lovin*, 339 N.C. 695, 713, 454 S.E.2d 229, 239 (1995). There is nothing in the record to indicate that the prosecutor's questions were asked in bad faith. In addition, the trial court sustained the objections, struck one question from the record, and issued a curative instruction. As such, there was no

prejudicial evidence introduced in response to the prosecutor's questions. The trial judge's action in sustaining the objections was sufficient to remedy any harm that resulted from the asking of the questions. *See Jaynes*, 342 N.C. at 280, 464 S.E.2d at 467 (holding that the trial court's actions in sustaining the defendant's objections were sufficient to remedy any possible harm resulting from the mere asking of the three questions by the prosecutor); *cf. State v. McLean*, 294 N.C. 623, 634-35, 242 S.E.2d 814, 821 (1978) (holding that the trial court did not abuse its discretion in denying defendant's motion for mistrial where the trial court sustained defendant's objections to a question by the prosecutor containing improper information and instructed the jury to disregard the question). We overrule defendant James' argument. We note that defendant John advances the same argument on appeal. For the foregoing reasons, we also overrule defendant John's argument.

## C. **Exclusion of evidence of cell phone use**

Defendant James next argues that the trial court's limiting of his cross-examination of the State's witness, Beau Dean, constitutes reversible error. We disagree.

In North Carolina, a "trial court has broad discretion over the scope of cross-examination." *State v. Call*, 349 N.C. 382,

411, 508 S.E.2d 496, 514 (1998) (citation omitted). The trial court's ruling regarding the scope of cross-examination "will not be held in error in the absence of a showing that the verdict was improperly influenced by the limited scope of the cross-examination." *State v. Woods*, 307 N.C. 213, 221, 297 S.E.2d 574, 579 (1982).

During Beau Dean's cross-examination, defendant John attempted to elicit testimony regarding the total number of cell phone minutes he and defendant James used during the 28 October to 27 November 2011 billing cycle. Defense counsel asked Beau Dean, "how many minutes were used in this billing cycle?" The State objected, and the trial court sustained the objection. On appeal, defendant James contends the trial court erred in sustaining the State's objection to this question because "the outstanding feature of the State's case was the extraordinary frequency of cell phone communications between [defendant John and defendant James] at and around the time of the robbery[,]" and the excluded evidence was therefore relevant to show that the high level of communication by each defendant was not peculiar to the day of the robbery.

Here, both the cell phone records entered into evidence and the testimony of Beau Dean established that defendant James and

defendant John used their cell phones to communicate with persons besides each other on 8 December 2011. In addition, two bank employees, Anne Garrett and Judy Price, testified that it was not uncommon for defendant John to be on the phone when he entered the bank. Finally, defendants' cell phone records spanning from 5 December 2011 to 9 December 2011 were entered into evidence. Thus, there was evidence before the jury that illustrated defendants' cell phone usage habits. Defendant James has failed to establish that the trial judge's limitation on Beau Dean's cross-examination improperly influenced the verdict in his case.

## D. **Admission of aggravating factor**

Defendant James argues he is entitled to a new sentencing hearing because the trial court failed to address him personally and comply with the procedures set forth under N.C. Gen. Stat. § 15A-1022.1(b) and N.C. Gen. Stat. § 15A-1022.1(a) (2013). We agree that the trial court erred. However, we hold that the error is harmless.

Under North Carolina's Blakeley Act, codified in N.C. Gen. Stat. § 15A-1022.1 (2013), we recognize that a defendant may admit to the existence of an aggravating factor or to the existence of a prior record level point under N.C. Gen. Stat. §

15A-1340.14(b)(7) before or after the trial of the underlying felony. N.C. Gen. Stat. § 15A-1022.1(d). In all cases in which a defendant admits to the existence of an aggravating factor, N.C. Gen. Stat. § 15A-1022.1 provides that the trial court shall comply with the provisions of N.C. Gen. Stat. § 15A-1022(a).

Under N.C. Gen. Stat. § 15A-1022(a),

> a superior court judge may not accept a plea of guilty or no contest from the defendant without first addressing him personally and: (1) Informing him that he has a right to remain silent and that any statement he makes may be used against him; (2) Determining that he understands the nature of the charge; (3) Informing him that he has a right to plead not guilty; . . .

N.C. Gen. Stat. § 15A-1022 (2013). The trial court must also address the defendant personally and advise the defendant that he or she (1) is entitled to have a jury determine the existence of any aggravating factors or points under N.C. Gen. Stat. § 15A-1340.14(b)(7); and (2) has the right to prove the existence of any mitigating factors at a sentencing hearing before the sentencing judge. N.C. Gen. Stat. § 15A-1022.1(b) (2013).

During defendant James' sentencing hearing, defense counsel admitted the following statutory aggravator under N.C. Gen. Stat. § 15A-1340.16(d)(12): that defendant James committed the offense while on pretrial release.

THE STATE: regarding the defendant, James Ryan Edmonds, in 11-CRS-64716, it's been alleged on the indictment returned March the 5th of 2012 for robbery with a dangerous weapon that occurred on or about December the 8th of 2011 that Mr. James Ryan Edmonds committed allegedly the robbery with a dangerous weapon offense while on pretrial release on another charge. Does he admit the existence of the aggravating factor listed on the indictment beyond a reasonable doubt or does he deny the existence of the aggravating factor that he committed-- allegedly committed this offense while on pretrial release on another charge?

DEFENSE COUNSEL: Your Honor, . . . we would admit that at the time of the offense [defendant James] was on pretrial release for another offense; again, maintain innocence in terms of this charge, but we would admit that at the time we were on pretrial release.

. . .

THE COURT: All right. Does [defendant James] waive any further notice of that aggravating factor?

DEFENSE COUNSEL: He would.

THE COURT: Has he had sufficient notice that it exists?

DEFENSE COUNSEL: He has.

THE COURT: And that the State intended to proceed on it?

DEFENSE COUNSEL: He has.

THE COURT: And that if admitting it, it could

enhance the punishment against him?

DEFENSE COUNSEL: Yes, sir.

THE COURT: And increase the punishment he could receive?

DEFENSE COUNSEL: Yes, sir.

THE COURT: Does he desire to have a jury determine it?

DEFENSE COUNSEL: No, sir.

The crux of defendant's argument is that his stipulation or admission of the aggravating factor was not made knowingly and voluntarily given that the trial court failed to address him personally and conduct the colloquy required by N.C. Gen. Stat. §§ 15A-1022.1(b) and 15A-1022(a).

We recognize that North Carolina's Blakely Act requires the trial court to address defendants personally, advise them that they are entitled to a jury trial on any aggravating factors, and ensure that their admission is the result of an informed choice. N.C. Gen. Stat. §§ 15A–1022.1(b), (c) (2013). A review of the transcript in the instant case shows that the trial court neglected to follow this procedure. We review such errors for harmlessness. *State v. Blackwell*, 361 N.C. 41, 49, 638 S.E.2d 452, 458 (2006). "In conducting harmless error review, we must determine from the record whether the evidence against the defendant was so overwhelming and uncontroverted that any

rational fact-finder would have found the disputed aggravating factor beyond a reasonable doubt." *Id*. (citation and quotations omitted).

> The defendant may not avoid a conclusion that evidence of an aggravating factor is uncontroverted by merely raising an objection at trial. *See*, *e.g.*, *Neder,* 527 U.S. at 19, 119 S.Ct. 1827. Instead, the defendant must bring forth facts contesting the omitted element, and must have raised evidence sufficient to support a contrary finding.

*Id*. at 50, 638 S.E.2d at 458 (citations and quotations omitted).

Here, the aggravating factor found by the trial judge, not the jury, was that the crime was committed while defendant was on pre-trial release. Defense counsel specifically admitted "that at the time of the offense [defendant James] was on pretrial release for another offense." Defendant James neither objected at trial to this admission nor did he present any argument or evidence contesting the sole aggravating factor. On appeal, defendant James similarly makes no argument that he was not in fact on pretrial release on 8 December 2011. Thus, he has raised no evidence to support a contrary finding of the aggravating factor. We hold that defendant James' failure to object and his failure to present any argument or evidence contesting the sole aggravating factor constitute uncontroverted

and overwhelming evidence that defendant committed the present crimes while on pretrial release for another offense. Should this case be remanded to the trial court for a jury determination of this aggravating factor, the State could offer evidence in support of the aggravator "in the form of official state documents and the testimony of state record-keepers." *Id*. at 51, 638 S.E.2d at 459. Accordingly, the Blakely error which occurred at defendant James' trial was harmless beyond a reasonable doubt.

## E. Defendant John's argument

Defendant John argues, and the State concedes, that his Judgment and Commitment form contain clerical errors and must be remanded for correction. We agree.

The transcript of defendant John's sentencing hearing shows that the trial judge sentenced him as a Prior Record Level IV offender and ordered him to pay $6,841.50 in attorney's fees. However, defendant John's Judgment and Commitment form incorrectly lists him as a Prior Record Level II offender and states that defendant John owes $13,004.45 in attorney's fees. This sum is the amount of attorney's fees owed by defendant James. Defendant concedes that his sentence of a minimum 97 months and a maximum of 129 months is correct.

Here, the trial court committed a clerical error. *See State v. Taylor*, 156 N.C. App. 172, 177, 576 S.E.2d 114, 117-18 (2003) (defining clerical error as "an error resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination"). "When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth." *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696-97 (2008) (citations and quotations omitted). Accordingly, we remand for the correction of the clerical errors described above in the Judgment and Commitment form (correcting defendant's Prior Record Level from II to IV and correcting the amount of attorney's fees owed from $13,004.45 to $6,841.50).

### III. <u>Conclusion</u>

In sum, the sole error the trial court made in defendant James' trial was harmless error. The trial court did not err in defendant John's trial. However, defendant John's Judgment and Commitment form contains a clerical error. Accordingly, we remand for the correction of the clerical errors described above.

No prejudicial error in part; no error in part; remanded for correction of clerical error.

Judges CALABRIA and STEPHENS concur.