THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* JANET ELURA PAULIN, Respondent.

Third Department, May 27, 1969.

106

Loren N. Brown, District Attorney (David A. Wait of counsel), for appellant.

E. Stewart Jones (Thomas J. O'Connor, Sr., of counsel), for respondent.

STALEY, JR., J.   This is an appeal from two orders of the County Court of Saratoga County both entered May 13, 1968, (1) which granted a motion by the defendant to suppress the use of oral statements made by the defendant to Lieutenant Kuzia and Captain Chieco on June 12, 1967 as evidence against the defendant, and (2) which granted a motion by the defendant to suppress the use of a metal cooking pot and a kitchen knife as evidence against the defendant upon the trial of the action.

On Monday morning, June 12, 1967 prior to 10:00 A.M. Michael Okon, defendant's son called the New York State Police at the Brunswick Station and reported he had found the body of his stepfather, Sergeant Joseph Paulin of the New York State Police, in their home at Clifton Knolls, Town of Clifton Park, Saratoga County, New York. Lieutenant Raymond J. Kuzia was directed by troop headquarters to proceed to the Paulin residence, arriving at approximately 10:00 A.M.   Upon his arrival he was met by Okon and was led into the house to a bed-

room where he found the dead body of Sergeant Paulin in a state of decomposition in a closet. Lieutenant Kuzia called troop headquarters at Loudonville, New York for assistance and entered the living room area and saw the defendant for the first time. Lieutenant Kuzia introduced himself to the defendant and asked her what happened several times during a 20-minute period but received no answer. Observing that defendant had a bandage on her left hand, Kuzia inquired several times about what was wrong with her hand and finally defendant said "My husband cut it ". Again asking how it happened several times without an answer, defendant finally said, " We had an awful fight — an awful fight." The Lieutenant then advised the defendant of her rights and gave her the *Miranda* warnings. (*Miranda* v. *Arizona,* 384 U. S. 436.) Defendant then requested that she wanted a lawyer and asked Kuzia to phone James Straney, an attorney having an office at Latham, New York. About 11:25 A.M. Mr. Straney called the Paulin residence and finally talked to the defendant and said he would send his associate Richard D'Alessandro to represent her, and that D'Alessandro would start immediately for her home. After the defendant's request for a lawyer, Kuzia, the ranking officer present, instructed his subordinates to refrain from questioning the defendant.

Subsequent to the phone call, Captain Chieco, an Inspector of the New York State Police, arrived at the Paulin home at about 11:30 A.M. He was briefed by Kuzia as to what had transpired up to that point and knew that the defendant had been given the *Miranda* warnings, and that an attorney was on the way to the home to represent her. Chieco entered the living room and introduced himself to the defendant and said, " Mrs. Paulin, I know this is a terrible tragedy." He then acknowledged that she had been advised of her rights and had requested an attorney, and repeated the rights for the defendant to make sure she understood them, and further said, " As long as you wanted your attorney, and as long as he is coming, you understand you shouldn't say anything." Continuing with the conversation he then said, " Well, you know, as bad as this thing is, there are certain things that have to be taken care of. As, you have to think of the funeral. Do you have any thoughts about an undertaker — you would want to handle this? " The defendant answered, " I want you to know it wasn't my fault " and " I couldn't help it. What did you expect me to do? " Defendant then kept on talking, saying that she and her husband had violent arguments for years; that he hit her a lot; and that Thursday they had an argument and he had cut her

hand, and she had killed him while he was in bed sleeping, hitting him on the head several times with a cooking pot. Chieco then asked her to show him the pot and she led him to the kitchen and pulled out one of the drawers and showed him a particular pot which Chieco turned over to Investigator Pollack to mark for identification and to be custodian of the evidence. During the period of such interrogation, defendant was described by prosecution witnesses as being "in a highly emotional and tense state", "in a state of shock", "distraught", and as appearing "hungover—at the end of a state of intoxication". After Kuzia's arrival defendant was also always in the presence of at least one law officer and after the arrival of a police matron, she was even accompanied by the matron when she went to the bathroom.

The coroner arrived about 11:30 A.M. and examined the dead body of Sergeant Paulin and observed stab wounds in the back which information was related to Chieco who ordered a complete search of all knives in the house which were taken into custody by Investigator Pollack for identification, and for testing at the police laboratory, one of which appeared to have blood stains on it. At this point Chieco advised Mrs. Paulin and her attorney that she was under arrest for the crime of murder in the first degree. The defendant was thereupon taken before a Justice of the Peace for arraignment on an information charging murder in the first degree, where she entered a plea of not guilty, and requested a preliminary hearing which was held on August 17, 1967, resulting in a finding that there was reasonable ground to believe that the defendant was guilty of the crime as charged. On September 12, 1967 defendant was indicted for the crime of murder in the second degree.

Thereafter, on March 18 and 19, 1968, a pretrial hearing was held by the County Judge of Saratoga County on two motions made by the defendant to suppress the oral statements made to Lieutenant Kuzia and Captain Chieco as evidence against her in that they were obtained from her during impermissive pre-arraignment in-custodial interrogation by the New York State Police in violation of her constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, and for suppression of the metal cooking pot and knife as having been obtained by an unreasonable search and seizure in violation of the Fourth Amendment of the United States Constitution.

The testimony at the pretrial suppression hearing clearly indicates that the defendant was physically deprived of her freedom from the moment Kuzia contacted her, since at least

one law officer was thereafter always with her, and at times the number of State Police present, within, or immediately outside of the house, numbered seven or eight. The repetition of one single unanswered question for the first 20 minutes of Kuzia's initial encounter with the defendant emphasized the fact that she was undergoing in-custodial detention and impermissive interrogation. From the very beginning of the interrogation, and after defendant was informed that her husband was dead, she was unquestionably led to believe that her freedom to leave or not to leave her home was totally restrained.

In *Orozco* v. *Texas* (394 U. S. 324), the United States Supreme Court held inadmissible incriminating statements made by the defendant to police officers interrogating him in his bedroom at 4:00 A.M. in the morning following the crime committed shortly before midnight, without first informing him of his right to remain silent, his right to have the advice of a lawyer before making any statement, and his right to have a lawyer appointed to assist him if he could not afford to hire one. The court stated (pp. 326–327) : " The State has argued here that since petitioner was interrogated on his own bed, in familiar surroundings, our *Miranda* holding should not apply. It is true that the Court did say in *Miranda* that ' compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.' 384 U. S., at 461. But the opinion iterated and reiterated the absolute necessity for officers interrogating people ' in custody ' to give the described warnings. See *Mathis* v. *United States,* 391 U. S. 1 (1968). According to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The *Miranda* opinion declared that the warnings were required when the person being interrogated was ' in custody at the station *or otherwise deprived of his freedom of action in any way.*' 384 U. S., at 477. `(Emphasis supplied.) "

From the moment Kuzia commenced interrogating defendant, the atmosphere of her home was overwhelmingly police dominated. " Without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely ". (*Hoffa* v. *United States,* 385 U. S. 293, 304.)

" No one can read the Supreme Court's explanation of the purpose of the warnings and not conclude that an examination

of the circumstances and the atmosphere in which the interrogation takes place is essential to a determination of whether a person, who has not actually been physically detained or formally placed under arrest, has been deprived of his freedom in any significant way so as to require the police to give the necessary warnings." (*People* v. *Rodney P.* [*Anonymous*], 21 N Y 2d 1, 5–6.)

Under the circumstances here, the defendant was physically deprived of her freedom of action, and was placed in a situation in which she reasonably believed that her freedom of movement was restricted by the interrogation. (*People* v. *Rodney P.* [*Anonymous*], *supra*.) The admissions made by the defendant after the 20-minute questioning period were not comparable to statements made voluntarily, spontaneously, and without interrogation which have been held admissible absent the *Miranda* warnings. (*People* v. *Torres,* 21 N Y 2d 49; *People* v. *R. N.,* 23 N Y 2d 963.) The trial court properly ordered the suppression of defendant's oral statements made to Lieutenant Kuzia.

Defendant further contends that the oral statements made by her to Captain Chieco in the absence of counsel, after she had been given the *Miranda* warnings, and after Chieco was informed that she had requested an attorney to represent her who was en route to her home at the time, are inadmissible against her on a trial of the charges.

It has been repeatedly held that a confession or oral incriminating statements made to a police officer in the absence of counsel after a request had been made for representation by an attorney are constitutionally inhibited. (*Miranda* v. *Arizona,* 384 U. S. 436, *supra*; *People* v. *Baker,* 23 N Y 2d 307; *People* v. *Arthur,* 22 N Y 2d 325; *People* v. *Vella,* 21 N Y 2d 249; *People* v. *Gunner,* 15 N Y 2d 226.)

In the *Miranda* case it was stated (pp. 444–445): " If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning."

And (pp. 473–474): " Once warnings have been given, the subsequent procedure is clear. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

In *People v. Arthur* (*supra,* p. 329), the court stated: " Once the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant, the accused's right to counsel attaches; and this right is not dependent upon the existence of a formal retainer. * * * Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel (*People v. Vella,* 21 N Y 2d 249)."

Chieco's conversations with defendant after he had knowledge of her request for legal representation were prohibited since he had a duty to respect defendant's right and decision to remain silent and no matter how innocent he believed the substance of his conversation was with defendant, he was bound to cease any and all interrogation. As the trial court stated in a very comprehensive and learned opinion: " Speaking to her about the obviously ultimate need of an undertaker for proper care and disposition of the body, which, according to all the witnesses, after some three days of decomposition, was already adding to the atmosphere, was not necessary at that moment and was not in proper pursuit of his duties."

Any statements made by defendant to Chieco were in violation of her constitutional rights to remain silent and are inadmissible as evidence against her.

Appellant contends that defendant intelligently and freely waived her constitutional right to remain silent when she volunteered the inculpatory statements to Captain Chieco. Waiver of such right is accomplished only if defendant waives it understandingly, competently and intelligently (*People v. Stephen J. B.,* 23 N Y 2d 611; *People v. Witenski,* 15 N Y 2d 392); by explicit and affirmative speech (*People v. Jacobsen,* 57 Misc 2d 1046); and in the presence of defendant's attorney after representation has been requested (*People v. Arthur,* 22 N Y 2d 325, *supra; People v. Jackson,* 22 N Y 2d 446). " The use of a statement, taken in the absence of counsel after a defendant has requested a lawyer, violates ' the fundamental fairness essential to the concept of justice ' ([*People v. Noble*] 9 N Y 2d, at p. 574)." (*People v. Jackson, supra,* p. 452.)

In view of defendant's physical and mental state at the time of Chieco's interrogation and the presence of many law enforcement officers, the trial court properly held that the evidence did not establish beyond a reasonable doubt that defendant

knowingly, intelligently and affirmatively waived her rights under the Fifth and Sixth Amendments.

The final contention of the appellant is that the metal pot and kitchen knife taken by the police officers from defendant's kitchen were acquired as the result of a reasonable search or seizure, and that their use as evidence against the defendant should not have been suppressed.

It is well settled that if admissions are obtained from a suspect as a result of unconstitutional police procedures which lead to the discovery of tangible evidence relating to the alleged crime, such tangible evidence in the absence of waiver will not be admissible at the trial of the individual who made the admissions. (*Nardone* v. *United States*, 308 U. S. 338; *Wong Sun* v. *United States*, 371 U. S. 471; *People* v. *Ressler*, 17 N Y 2d 174; *People* v. *Grossman*, 45 Misc 2d 557, affd. 20 N Y 2d 346.)

Since the trial court properly excluded the statements made by the defendant to Chieco, which statements first made reference to the kitchen pot as an instrument by which the crime was committed, the exclusion of the metal pot as tangible evidence was likewise proper, since it was found in consequence of the incompetent statements.

The appellant claims, however, that the kitchen knife is admissible evidence, although seized without a search warrant, on the ground that its seizure was incidental to a lawful arrest. It is undisputed that defendant was placed under arrest after the kitchen had been searched and the knife had been seized. It is the arrest that confers the power to make an incidental search of the premises and the search must follow the arrest and not precede it. (*People* v. *Loria*, 10 N Y 2d 368; *People* v. *O'Neill*, 11 N Y 2d 148.) " The subsequent arrest, based as it was, in part, upon an illegal seizure, cannot be the basis of a search incident to a lawful arrest (*Johnson* v. *United States*, 333 U. S. 10, 16); the arrest ' must be validated without any resort to the fruits of the search '; (*United States* v. *Walker*, 246 F. 2d 519, 525; *Lee* v. *United States*, 232 F. 2d 354, 355). ' If, therefore, it is necessary to rely on the search to justify the arrest, the conclusion is inescapable that a search that cannot be justified by what it turns up cannot justify the arrest '." (*People* v. *O'Neill*, *supra*, p. 153.)

The trial court found that the coroner's finding of stab wounds on the victim's body did not, in and of itself, constitute "reasonable cause" for defendant's arrest which was based, instead, on the illegally obtained oral statements made by the defendant. The trial court, therefore, properly held that beyond a reasonable doubt, for the purpose of justifying the alleged incidental

search, the arrest was not legal, and the seizure of the knife was not incidental to a lawful arrest and, therefore, the knife was inadmissible.

The determinations of the trial court should, in all respects, be affirmed.

The orders should be affirmed.

GIBSON, P. J., HERLIHY, AULISI and COOKE, JJ., concur.

Orders affirmed.