OPINION OF THE COURT
Julian F. Kubiniec, J.
Defendant, Rudolph L. Manzella, Jr., by notice of omnibus motion seeks an order suppressing "all statements involuntarily made and obtained in violation of his constitutional rights.” More specifically, defendant seeks to suppress those oral statements and admissions made by him during an eight *957 plus hour siege of his residence by numerous Erie County Deputy Sheriffs, including two SWAT teams, as well as numerous other police officers responding from various police departments.
The prosecution alleges that defendant Manzella shot, without provocation or warning, two Erie County Deputy Sheriffs who had exited from clearly marked police cruisers and who were proceeding up his driveway intent on serving an arrest warrant. One officer was fatally wounded and the other, though seriously wounded, radioed for assistance.
Responding officers were soon on the scene, encircled defendant’s residence, commandeered the next door neighbor’s house, and telephoned the defendant. It is these telephone responses of defendant, and particularly his admissions of shooting two police officers, that are the statements defendant now seeks to suppress as being involuntarily made, i.e., made in a custodial setting without the benefit of prior Miranda warnings. ("Defendant was literally held captive in his home, completely surrounded by a cadre of law enforcement personnel” [defendant’s mem].)
At oral arguments before this court, Part 10, Supreme Court, Erie County, held on January 17, 1991, both the defendant and People stipulated that at no time during the siege and prior to defendant’s arrest was defendant ever Mirandized. A testimonial hearing was held on May 20, 1991 and this court has reviewed the testimony of Deputy Sheriff Christopher Clark and Senior Investigator Dennis Rankin and has also reviewed a transcript of and listened to the recorded conversations between defendant and police personnel. The issue thus presented is whether defendant’s recorded oral statements were involuntarily made in violation of his constitutional privilege against self-incrimination.
Upon review, this court now finds as follows:
As is common in stand-off situations with an armed and barricaded gunman, police officers initially seek to establish communication in order to apprise themselves of the gunman’s whereabouts, the existence of any hostages or innocent bystanders, the mental state of the gunman, whether he is intoxicated or under the influence of drugs, etc. Additionally, police officials attempt to use a police officer specially trained in talking to homicidal/suicidal gunmen and through telephonic communication seek to defuse the situation, by convincing him that they do not seek to hurt him, that escape is *958 hopeless, that his only hope to better his circumstances is to surrender, and that by cooperating and surrendering he actually betters his situation. Obviously, by keeping up a string of conversation, the police are able to secure the gunman to one location and distance the time from the original shooting thereby easing the gunman’s agitation.
Arriving at the scene of an ambush-style shooting with two police officers wounded and down, obviously the responding officers’ best and safest hope of confronting the shooter is via telephone.
In the instant case, initial contact was made at 2:23 p.m. by Erie County Sheriff Deputy Christopher Clark, Chief of Administrative Services, who testified that he heard the radio call by Officer Carlson (one of the wounded Deputies) of a man down and request for assistance while driving his patrol car to the Sheriff Deputies’ Control Headquarters at Chestnut Ridge Park. There he learned of the shootings, the name and phone number of the suspect, and that other Deputies were responding and on the scene. Chief Clark thereupon called defendant’s home 4 or 5 times before he received a response. The phone call was taped. Chief Clark stated his purpose was to locate the suspect, to determine if anyone else was within the suspect’s home, and to get defendant into custody, unarmed. Chief Clark, therefore, immediately advised defendant Manzella to put his hands over his head and to go out the front door. While attempting to calm Manzella, Clark asked if anyone else was in the house (mother, father, sister). When Manzella threatened to hang up, Clark stated: "Talk to me, talk to me. Don’t hang up on me”; whereupon Manzella spontaneously and angrily began verbalizing his feelings. At no time did Clark ask any questions, either directly or indirectly, seeking information or incriminating responses from Manzella. Rather, he merely continued to ease the situation by repeating, "Let’s not have anybody else hurt. Nobody is gonna hurt you.” After three outbursts, Manzella discontinued the conversation and hung up.
Defendant’s comments during this first contact, the court finds, most certainly fall within that category of statements made to initial questions of a police officer who, upon first arriving at a volatile scene, seeks to clarify the situation and were not questions made in a paramount effort to elicit evidence of a crime. (See, People v Johnson, 59 NY2d 1014 [1983]; People v Chestnut, 51 NY2d 14 [1980], cert denied 449 US 1018.)
*959 However, defense counsel contends that, if it were not immediately clear to defendant, it soon became obvious that he was surrounded by a cadre of police officers, including camouflaged SWAT teams and helicopter patrols, forming a solid police barricade. This circumstance, counsel argues, is tantamount to placing defendant in custody and that, therefore, any telephonic communication thereafter should have been preceded by Miranda warnings. Counsel would have the court apply the common legal definition of "custody”, namely: would a reasonable man, innocent of any crime, believe that his freedom to leave the area of interrogation was significantly restrained. The affirmative answer being obvious, counsel maintains that, as the defendant was in custody and without benefit of prior Miranda warnings, his comments and admissions should be suppressed as involuntarily made.
The prosecution in reliance on People v Flannery (137 AD2d 615 [1988]) contends that, albeit lengthy telephonic communication, it was not conducted within a custodial ambiance and that the defendant was free to move about his house and to talk or not to talk on the telephone. Although there is case law that suggests that police inquiries via a telephone cannot be deemed custodial, there appear to be few cases which deal with a surrounded defendant facing an armed police barricade.
In Flannery (supra, at 616) the police and defendant engaged in some 2 to 2 Vi hours of conversation in which "the defendant revealed that he had shot his wife four times.” However, the holding in Flannery appears to affect only the initial questioning of the defendant by police officers who, in response to a radio communication regarding gunshots, arrived at defendant’s apartment, heard a gunshot and knocked on the apartment door. In response to initial police inquiries at the door, the defendant remarked "that there were no injured children inside the apartment and that he had a problem with his wife, which was no longer a problem inasmuch as he had shot her and she was dead.” (Supra, at 616.) These remarks, the Flannery court found, were made in a noncustodial setting, by a talkative defendant, and were beyond the scope of the initial police inquiry, which inquiry was made by a police officer engaged in his primary role of crime preventor and provider of emergency assistance. The court’s ruling does not, therefore, appear to extend to any admissions made during the lengthy telephone conversation therein.
*960 Nevertheless, Flannery (supra) does point us in what this court believes is the right direction.
In recognition of a propensity for law enforcement officials to coerce admissions from persons suspected of criminal activity thereby violating their Fifth Amendment guarantee against compulsory self-incrimination, the United States Supreme Court laid down the prophylactic rules now commonly referred to as Miranda warnings. (Miranda v Arizona, 384 US 436 [1966].) These warnings however, although extending to interrogation which in various custodial circumstances is deemed inherently coercive, are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.” (Michigan v Tucker, 417 US 433, 444 [1974].)
Thereafter, courts have struggled to determine at what point, i.e., under what set of factual circumstances, does police interrogation become custodial. Generally, the courts seek to solve this factual issue by applying the reasonable man test to determine when the atmosphere of an interrogation ceases to be neutral and becomes coercive, and thus view, for example, station house or police car interrogations as inherently coercive, but private residences or public places as inherently neutral.
Arguably, in a broad sense, no reasonable person would say that Manzella, armed and still secure behind his own door, was in police custody, notwithstanding the amount of fire power surrounding him. However, in the face of such fire power, if not, indeed, police aggression any questioning directed towards defendant is certainly done in a highly charged if not, as defense counsel suggests, a coercive atmosphere. (The court notes, in passing, that, as in the initial contact, at no time during the extended telephone contacts did the officers communicating with defendant ever appear to be attempting to extricate any incriminatory information or admissions.)
Is Manzella in custody? Would a reasonable and otherwise innocent person believe his freedom to leave was significantly restricted if he were this defendant, i.e., the lone occupant of a house on whose driveway apron two uniformed police officers lie shot and bleeding and which is, within minutes of the shooting, surrounded by police personnel and equipment, weapons drawn and aimed at the house?
Or, are not the police still attempting to apprehend their *961 suspect who is clearly dangerous and who on initial phone contact with police angrily announces:
"You want me, you’re going to have to kill me, shithead * * * I ain’t worried about being hurt. I’m already hurt. I’m already dead. When I took a man’s life, that was that. I don’t plan on spending the rest of my life in jail”.
And who, throughout the siege, threatens:
"When I turn my back to catch a breath of air, I don’t want to have to know I have to turn around and shoot first and look later, you know what I mean?”
"I think you gotta take me out.”
"I’m gonna stand up here and wait for you guys to take me out.”
"If I come out it’ll be for one thing, to die.”
"I’m gonna have to take my own life.”
"I’m tired. I’m thirty years old. I’m nobody in life. I wanta just go. I just want to go, get it over with.”
"I live and die by the gun. Just like they do.”
"I’m not going to jail, I’m gonna die first. If I have to do it myself.”
"Who the hell wants to go up for murder, even if I did get bail. I don’t wanna go to jail. I’d rather get shot to death.” "Don’t be thinking that I’m bluffing. Cause I ain’t going up for murder, man. I ain’t giving up the rest of my life in a goddamned jail.”
Or, are not these inquiries merely begging the issue and overlooking the obvious?
Miranda warnings serve to forestall coercive police investigation. But police investigation is secondary to the prime function of law enforcement, i.e., to stop crime before it is committed and to protect ordinary citizens from crime and the dangers concommitant therewith. In the exercise of this duty, police officers are at liberty to take reasonable measures to restrain suspects and to put incriminating questions to them in order to quell a volatile situation and to protect the general public, themselves, and perhaps even a suspect, intent on self-destruction, from harm.
For this reason, two narrow exceptions have been carved from the mandate of providing Miranda warnings before interrogation of a suspect in custody:
1. The missing person inquiry, i.e., questions reasonably *962 prompted by a concern to locate a missing person, suspected of being the victim of a crime and whose safety and life may be in danger. (See, People v Krom, 91 AD2d 39, affd 61 NY2d 187 [1984].)
2. The public safety inquiry, i.e., questions reasonably prompted by a concern for public safety which, under a myriad of possible circumstances, would outweigh the prophylactic warnings of Miranda which are aimed at protecting an individual’s guarantee against self-incrimination. (See, New York v Quarles, 467 US 649 [1984].)
Clearly, the case at hand falls within the public safety exception. Even if this court or a jury were to find defendant to be "in custody”, nevertheless, were not the police phone callers about their primary role of securing an emergency situation? Manzella was an armed and dangerous person, holed up in the confines of a neighborhood surrounding, intent to either a shoot-out with police or an armed confrontation whereby the police would be forced to shoot him. Later, as the siege dragged on, it became apparent that Manzella might even choose to shoot himself. It was thus in the public and defendant’s best interests that the police open and maintain a line of communication with him in the hope of quieting his anxiety, guaranteeing his presence within a known area of his home, and ultimately convincing him to put down his weapon and surrender. Whether these efforts took but a few minutes as in Quarles (supra) or many hours as occurred here and whether the setting was custodial or noncustodial, so long as the emergency condition continued unabated, the overriding concern for the safety of the public, the police, and even the defendant is paramount to defendant’s individual right against self-incrimination.
While it is true, as defense counsel urges, that once the police established extended contact with defendant, they had many opportunities to advise him of the Miranda warnings, to do so, however, would have only provided defendant with reason to discontinue communication, thereby destroying the one thing that was at least maintaining the status quo and that was probably preventing a more violent confrontation. To tell defendant that he had a right to remain silent and that what he said to the police could and would be used against him, obviously is in direct opposition to immediate safety considerations.
Similarly, to attach, as defense counsel further argues, *963 defendant’s right to counsel to all times during this confrontation, so as to exclude any police oral contact with defendant and now suppress defendant’s admissions during that contact (because the police knew or should have known of defendant’s pending charge and retention of counsel in that prior matter) would negate police efforts in their primary duty to reach a peaceable solution to an emergency situation and is equally unwarranted. (See, People v Krom, 61 NY2d 187, 199, supra; People v Gantz, 104 AD2d 692 [1984]; cf., Matter of John C., 130 AD2d 246 [1987].)
Defendant’s motion to suppress his recorded telephonic communications is denied.