THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOANNE
RIPIC, Respondent.

Third Department, September 10, 1992

## APPEARANCES OF COUNSEL

*Robert M. O'Leary (Kenneth S. Kagan* of counsel), Binghamton, for appellant.

*Gerald F. Mollen, District Attorney (Kevin P. Dooley* of counsel), Binghamton, for respondent.

*Joseph Calluori (Teresa A. Curtin* of counsel), New York

City, for New York State Association of Criminal Defense Lawyers, *amicus curiae.*

### OPINION OF THE COURT

CREW III, J.

This is an appeal from County Court's order suppressing all written and nonwritten statements of defendant. The indictment charging defendant with murder in the second degree alleges that she and her son, Roy G. Rowe Jr., acting in concert, intentionally shot and killed defendant's husband, Thomas Ripic. The relevant and uncontroverted facts at the suppression hearing follow.

On July 12, 1990 at about 8:00 A.M., the police were dispatched to defendant's home in response to a reported death at the residence. Upon arrival, the police observed defendant standing on the enclosed front porch, pounding her fists on a window and screaming. They then found defendant's husband lying in a pool of blood on the front porch and determined that he was dead, apparently due to gunshot wounds to the head. Shortly thereafter, defendant lost consciousness and was taken by ambulance to the hospital at the direction of medical personnel who were on the scene. It was established that defendant was deaf and efforts were made to locate an interpreter. Eventually, Jane Long, who is deaf, and her daughter, Jennifer Long, were contacted by an Assistant District Attorney and asked to assist at the hospital. Although the Longs were not certified interpreters, they were active in the deaf community and had some knowledge of the various methods used to communicate with the deaf. Shortly after the Longs arrived in defendant's hospital room, two police investigators arrived and entered defendant's room after learning from hospital staff that it was medically appropriate for them to talk to defendant.

The investigators began questioning defendant at about 11:17 A.M. As defendant lay in her hospital bed, connected to a heart monitor and receiving dextrose intravenously, Jennifer Long sat at the foot of the bed, Jane Long was on one side of the bed and the investigators were on the other side. Because Jennifer can hear, she interpreted the officers' questions for defendant, using a combination of voice, hand signs and finger-spelling. Defendant would answer in sign and Jane would speak defendant's answer. If Jennifer had difficulty with a particular sign, Jane assisted. Through this process,

defendant related a series of events leading up to the discovery of the victim's body, which implicated neither herself nor Rowe. Defendant's explanation was communicated by telephone to other officers who were questioning Rowe. The investigators at the hospital were instructed to clarify discrepancies between defendant's version of the events and Rowe's and were also advised, "While you're interviewing her, consider that it's possible this is the person that shot [the victim]."

Informed of the discrepancies, defendant related a more detailed version of the events which culminated in defendant's assertion, "I had to kill him." Again, the questioning stopped and this information was conveyed to the other investigators, who instructed the investigators at the hospital to clarify the statement. In response to further inquiry, defendant indicated that she and Rowe wanted to kill the victim because he was abusive and she felt that she could not divorce him. Thus, defendant gave her son the key to a gun cabinet that was in the house. The next morning, Rowe awakened her and said "it's done". At about 12:34 P.M., defendant was released from the hospital at the officers' request and was taken to the police station. The Longs went to the police station as well. Defendant was not advised of her *Miranda* rights while she was at the hospital.

Following the 10-minute ride from the hospital to the police station, defendant was taken to the bathroom by one of the investigators. Thereafter, defendant was advised of the *Miranda* warnings and Jennifer Long translated these warnings to sign language. Jennifer could not recall at the hearing, however, exactly what the investigator said or how she signed the warnings to defendant. Jane Long recalled that Jennifer did not use the sign, "right", because the Longs "weren't sure [defendant] would understand that * * *. [W]hen [Jennifer] said you have the right to remain silent, it was more like you can stop talking. You're allowed not to say any more." The investigators again posed their questions through Jennifer and Jane interpreted defendant's answers. Although the police department had a stationary video camera, only a typewriter was used to record the investigators' questions and defendant's responses. After examining the typed statement, defendant inquired as to the definition of the word "attorney" and changed the statement, in her own handwriting, to more clearly indicate that it was not she but her son who actually killed the victim. Defendant then signed the statement. After

a lunch break, defendant was again advised of her *Miranda* rights and a second written statement was taken clarifying that defendant knew when she gave Rowe the key to the gun cabinet that Rowe was going to kill the victim.

█ County Court suppressed all of defendant's statements, concluding that she was "in custody" from the moment the investigators began to question her at the hospital by reason of the fact that her freedom to move was restricted by her attachment to the electrocardiogram and intravenous feeding bottle. In so doing, County Court ignored recent cases from the United States Supreme Court and the Court of Appeals which define with substantial specificity the nature and degree of the restriction of movement required for a finding that a person is "in custody" for *Miranda* purposes. For the reasons that follow, we hold that defendant was not "in custody" prior to her first inculpatory statement.

In *California v Beheler* (463 US 1121), the United States Supreme Court stated that "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' *of the degree associated with a formal arrest" (supra,* at 1125 [emphasis supplied], quoting *Oregon v Mathiason,* 429 US 492, 495). Contrary to the view implicitly adopted by the dissent, a finding of restricted movement or deprivation of "freedom of action" *(Miranda v Arizona,* 384 US 436, 444), even when effected by the police, does not, ipso facto, create a custodial situation. Rather, the particular detention or restriction of movement must rise to the level of a de facto arrest before an individual will be deemed "in custody" for purposes of *Miranda (see, Berkemer v McCarty,* 468 US 420; *People v Bennett,* 70 NY2d 891).

Both *Berkemer v McCarty (supra)* and *People v Bennett (supra)* dealt with investigatory inquiries made during the course of a roadside detention or traffic stop. A review of the salient facts in each case plainly reveals that the defendants in question were "seized" within the meaning of the 4th Amendment and that reasonable individuals in their positions, innocent of any crime, could only reach one conclusion —they were not "free to leave". Despite the significant restraints upon the defendants' freedom of action, the respective Courts declined to hold that the defendants were "in custody" for *Miranda* purposes.

Further support for the proposition that "custody" is synonymous with "de facto arrest" is found in *People v Hicks* (68 NY2d 234) and *People v Crocker* (125 AD2d 132). In *Hicks,* the Court of Appeals considered whether a particular detention was a lawful investigatory stop or an arrest and cited to *People v Yukl* (25 NY2d 585, *cert denied* 400 US 851) in support of its statement that "[w]e have rejected as standards for determining when a de facto arrest has taken place the wholly subjective belief of the officer, as well as that of the citizen * * * and looked instead to 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position' " *(People v Hicks, supra,* at 240, quoting *People v Yukl, supra,* at 589). This Court employed the reasonable person test of *Yukl* in *People v Crocker (supra)* and concluded that under the particular facts of that case, the defendant in *Crocker* was not "in custody" before the formal arrest because an innocent person in the defendant's position would not have reasonably believed that he or she was under arrest at that time *(People v Crocker, supra,* at 134-135).

It follows that essential to a determination that a person, who has not been formally placed under arrest, has been subjected to restraints comparable to a formal arrest is an examination of the circumstances and the atmosphere in which the questioning takes place in order to ascertain whether the concerns that powered *Miranda* are implicated *(see, Berkemer v McCarty, supra; Wilson v Coon,* 808 F2d 688). The *Miranda* decision was primarily concerned with prolonged, seemingly indefinite detention and interrogation that all too often takes place in an isolated chamber of the police station. The guilt of the suspect is taken as a given and merely requires confirmation, to be obtained by relentless questioning and deceptive stratagems. From all that appears in the record, we find nothing that indicates that defendant was "in custody" prior to her statement, "I had to kill him." When the police arrived at the hospital, they were in plain clothes and the Longs were already in defendant's room. According to the Longs, the investigators were patient, comforting, considerate and not threatening. During their questioning, defendant's doctor and a nurse occasionally entered the room in order to check on defendant's medical status. Notably absent from the record is any evidence that defendant objected to the presence of and questioning by the investigators, that defendant refused to answer, or that defendant requested that the investigators leave. Nor is there any indica-

tion that the investigators openly accused defendant of the crime or that the investigators communicated to defendant that she was a suspect and not a mere witness. In short, there is nothing in the record before us to indicate that defendant was restrained of her freedom of movement by the police to the degree associated with a formal arrest. Indeed, until that point in time that defendant stated "I had to kill him," there is nothing in the record to indicate that she was being detained in any manner except for an investigatory inquiry surrounding her discovery of the victim.

In finding that defendant was "in custody", County Court seemingly placed great reliance upon *People v Tanner* (31 AD2d 148). The facts of the instant case are readily distinguishable. In *Tanner,* the police learned of the defendant's identity as the man who had robbed a store and shot a policeman, and sent out an alarm for his apprehension. When the police arrived at the hospital, the defendant was not merely burdened by wires, tubes and needles, but he was "physically incapable of movement" as a result of an accidental gunshot wound *(supra,* at 149). The police officers attempted to interrogate the defendant, but for about an hour he made no response. "Finding antagonism and resistance to a joint interrogation, resort to a relay by different officers was had, until one was successful in gaining defendant's confidence" *(supra,* at 150). He then confessed. Having refused to respond to police questioning for an hour and then continually subjected to questioning by relay, a reasonable person in the defendant's position could only have believed that he was the only suspect, that he was not free to leave and that questioning would continue until the police received the "correct" response. In the instant action, there is nothing in the record which indicates that defendant refused to answer or objected to the questioning, or that the investigators proceeded in the face of any such protestation or resistance. Although defendant in the instant action may well have felt that she had to cooperate with the investigators, " '[a]n assumption that one is required to cooperate with the police can hardly be equated with an arrest' " *(People v Yukl, supra,* at 590, quoting *Hicks v United States,* 382 F2d 158, 161).

■ Initially, we note that while purporting to grant deference to the findings made and conclusions reached by County Court the dissent, in an effort to justify suppression of defendant's initial inculpatory statement, goes far beyond the analysis undertaken by County Court. We disagree with the asser-

tion by the dissent that the Court in *People v Turkenich* (137 AD2d 363) held that "a suspect's 'inability to speak or understand the language of [her] inquisitor' can render questioning inherently coercive and, hence, custodial". What the *Turkenich* Court said was that "[t]he inherently coercive atmosphere *was accentuated* by the defendant's recent immigration to the United States from a country [Russia] with a vastly different political structure and by his inability to speak or understand the language of his inquisitor" *(supra,* at 367 [emphasis supplied]), a rather unveiled reference to the KGB and the inherent coercive threat police presence would invoke upon any person of the defendant's socio-political background, a wholly objective determination. We note that there were other factors in *Turkenich* notably absent here that played a far greater role in that Court's determination that the defendant was in custody. The Court noted the defendant's significant diminished mental capacity and his frequent incoherent responses to questions put to him. Additionally, and perhaps most significantly, the Court observed that the defendant was questioned in the psychiatric ward of a hospital, where he had been confined pursuant to an involuntary commitment order *(see,* Mental Hygiene Law § 9.41) after having been picked up by the police for causing a disturbance in front of the Russian Embassy. At the time *Turkenich* was decided, Mental Hygiene Law former § 9.41 provided that "[a]ny peace officer * * * who is a member of the state police or of an authorized police department or force or of a sheriff's department *may take into custody* any person who appears to be mentally ill and is conducting himself in a manner which is likely to result in serious harm to himself or others" (emphasis supplied). Ergo, by the very terms of the statute, the defendant was in custody at the time the police began their questioning.

The dissent asserts that the atmosphere was police dominated beginning at defendant's home. Contrary to this reasoning, a factual finding of police presence does not automatically result in a finding of a police-dominated atmosphere—the very issue of custodial interrogation presupposes police presence. When the United States Supreme Court spoke of a police-dominated atmosphere in *Miranda,* it was referring to detention and interrogation that takes place in a setting *chosen by the police* to give the interrogators every psychological advantage, to deprive the suspect of all comfort and confidence, and to create an aura of police-invincibility and suspect-vulnerability *(Miranda v Arizona, supra,* at 449).

The dissent further asserts that "defendant's status as a suspect from the time the investigation commenced" is evidence that defendant was in custody. Such an assertion misapprehends the objective test enunciated in *People v Yukl* (25 NY2d 585, *supra).* "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation" *(Berkemer v McCarty, supra,* at 442). Indeed, "[t]he subjective intent of the officer * * * is irrelevant except insofar as it is conveyed to the individual" *(People v Joy,* 114 AD2d 517, 520).

The dissent opines that " '[defendant] was, in short, "at the complete mercy" of [the investigators], unable to escape or resist the thrust of [their] interrogation' " (quoting *Mincey v Arizona,* 437 US 385, 399, quoting *Beecher v Alabama,* 389 US 35, 38), because of her attachment to "wires, tubes and needles". The case upon which the dissent relies for that proposition reveals just how noncoercive the environment in this case was. In *Mincey v Arizona (supra),* the police officer told the hospitalized defendant that he was under arrest and continuously interrogated him despite the defendant's repeated requests to be left alone and to have a lawyer present. Here the dissent reasons that because defendant is deaf and was attached to an electrocardiogram and intravenous feeding bottle, she was easily dominated and controlled by the investigators and was, therefore, in custody. Not only does this reasoning ignore the purpose of the objective test for custody, which refuses to "place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question" *(People v Rodney P. [Anonymous],* 21 NY2d 1, 9-10), it smacks of a paternalistic attitude toward the hearing impaired, which implies that they require our constant protection—the hearing person's burden *(see,* Lane, *Is there a Psychology of the Deaf?,* 55 Exceptional Child 7).

Furthermore, the conclusion of the dissent that defendant was isolated from and unable to communicate with her family and friends is simply not supported by the record. All that appears is that defendant was a patient in the hospital presumably subject to visitation by her family or friends. Certainly nothing in the record evidences the contrary and County Court made no such finding.

Finally, we observed that the dissent's inclusion of the fact that the investigating police agency utilized the services of

demonstrably unqualified interpreters as a factor in arriving at a determination of "custodial interrogation" is inapt. Whether the Longs correctly interpreted the police officers' questions or the defendant's answers is of little relevance to the question of whether the interrogation was custodial absent some evidence that their interpretive actions were coercive, and there is no such evidence in the record. While that evidence may well have a bearing on the issue of whether defendant made the alleged incriminating statement, a question properly addressed by the fact finder at trial, it is not relevant to an analysis of whether defendant was in custody. However, for the reasons that follow, we believe that factor does indeed bear on the issue of whether there was a knowing and intelligent waiver of defendant's rights at the police station.

In the instant action, defendant was restrained by medical devices for medical purposes. Defendant was questioned by the investigators in front of two nonpolice witnesses, the interpreters, as well as defendant's doctor and a nurse. The police were patient and considerate in their questioning and nonaccusatory, and defendant did not protest this questioning. These facts disclose that defendant was not in a police-dominated atmosphere and was not subjected to the oppressive and abusive police tactics sought to be avoided in *Miranda (see, Mincey v Arizona,* 437 US 385, 399, *supra).* And while the investigators were instructed to treat defendant as the possible "shooter", this was never communicated to defendant. Under the circumstances of this case, a reasonable person in defendant's position innocent of any crime would clearly expect law enforcement authorities to investigate the death of her husband without believing that she was under arrest. That the police officers were thorough in their investigatory questioning does not render their questioning "custodial". Accordingly, we conclude that defendant was not in custody prior to her statement, "I had to kill him."

■ With regard to the questioning that followed that inculpatory statement, however, we conclude otherwise. The People contend that defendant's "ambiguous" statement, "I had to kill him," did not transform the noncustodial situation to a custodial one and that the poststatement inquiry by the investigators at the hospital was therefore proper under the circumstances. We disagree and affirm County Court's alternative finding that if defendant was not "in custody" prior to that statement, "there is absolutely no doubt" that she was

"in custody" after that statement. Contrary to the People's assertion, defendant's statement was clear and unambiguous, and it is utter sophistry to suggest that a person in defendant's position, having made such an incriminating statement to police officers concerning the very homicide they were investigating, would feel that she was not under arrest and was free to leave. Accordingly, we conclude that County Court properly suppressed the statements made by defendant at the hospital after her initial inculpatory statement.

Shortly after defendant's additional inculpatory statements at the hospital, defendant was released from the hospital at the officers' request and was taken to the police station for further questioning. It was at the police station that defendant was first advised of her *Miranda* rights. In suppressing all of the statements obtained at the police station, County Court concluded that such statements were the product of a continuous chain of events, which were interrupted only by the 10-minute trip there, implicitly recognizing that "a defendant under such continuous and custodial interrogation may well be put in such a state of mind that the *[Miranda]* warnings which would ordinarily suffice will no longer be enough to protect [her] rights" *(People v Chapple,* 38 NY2d 112, 115; *see, People v Bethea,* 67 NY2d 364, 367). We agree with County Court that the statements obtained at the police station must be suppressed. The evidence adduced at the suppression hearing demonstrates that defendant was almost continuously in the company of police investigators and subjected to questioning by them from the time of her initial inculpatory statement until the second written statement was completed at 3:40 P.M. Although there were brief interruptions to prepare for discharge at the hospital and to go to the bathroom and short intervals when the conversation digressed to unrelated topics, "[t]here was no clearly delineated hiatus in which it could be inferred that defendant had sufficient time of reflection to have been 'returned, in effect, to the status of one * * * not under the influence of questioning' " *(People v Beames,* 149 AD2d 817, 818, quoting *People v Chapple, supra,* at 115).

■ A second reason advanced by County Court for suppressing the written statements given by defendant at the police station was that the People failed to prove that the *Miranda* warnings were adequately and effectively communicated to defendant and that defendant knowingly and intelligently waived them. We agree. "To be valid, an accused's waiver of

his or her rights must be knowingly and intelligently made * * * This is essentially a factual issue that must be determined according to the circumstances of each case" *(People v Williams,* 62 NY2d 285, 288). A variety of methods are used to communicate with the hearing-impaired and County Court specifically found that defendant's language is American Sign Language and that "the Longs are not at all proficient" in this language. American Sign Language has an entirely different grammar and syntax from that of the Signed English Language, the language of the Longs. At the suppression hearing, Jane Long and Jennifer Long testified that they had almost no formal training in sign language, had never sought certification as interpreters and had no previous experience in interpreting in connection with legal matters. To assess Jennifer's interpretive and signing abilities, she was videotaped in the courtroom signing two versions of the *Miranda* warnings. County Court found that Jennifer's courtroom interpretation "fell far short of what the law requires" and concluded that her efforts at the police station were no better.

Because the police failed to preserve, by videotaping, the actual sign language communicated between defendant and the investigators *(cf., People v Alvarez,* 118 AD2d 785, *lv denied* 68 NY2d 912; *People v Gonzalez,* 150 Misc 2d 187, 195-196), and it was impossible for Jennifer Long to recreate the communications for the Court, there was simply no evidentiary basis to support the People's argument that the *Miranda* warnings had been effectively communicated to defendant. Similarly, we agree with County Court's finding that defendant had little understanding of the typed *Miranda* warnings she was asked to read. American Sign Language is an entirely different language from English, and written English is often incomprehensible to deaf individuals whose primary language is American Sign Language. Accordingly, we conclude that all of defendant's statements made after the initial inculpatory statement were properly suppressed.

MERCURE, J. (concurring in part and dissenting in part). Because the majority overemphasizes the objective test propounded by *People v Yukl* (25 NY2d 585, 589, *cert denied* 400 US 851), relies upon court decisions dealing with vehicular stops and limited street encounters which are not particularly useful here and rejects the determination of the trier of fact that defendant was "effectively 'in custody' from the moment [State Police Investigators Susan Mulvey and George Goodall]

began to question her" which, in our view, is not unsupported as a matter of law, we would affirm County Court's order in all respects.

It should be noted at the outset that, in matters of suppression great deference should be afforded to the determination of the hearing court, which was in a position to "assess the evidence and the credibility of witnesses" *(People v Ackerman,* 162 AD2d 793, 795). The question of whether a person is "in custody" is a factual matter to be determined by the trier of fact *(People v Waymer,* 53 NY2d 1053, 1054), and where different inferences may be drawn from the proof, the inference chosen by the trier of fact should not be disturbed unless unsupported by the evidence *(People v Yukl, supra,* at 588; *People v Slater,* 173 AD2d 1024, 1025-1026, *lv denied* 78 NY2d 974).

In our view there is support in the record for County Court's factual determination that defendant was physically deprived of her freedom and, thus, in custody from the moment the investigators arrived at her hospital room *(see, People v Centano,* 76 NY2d 837). Interrogation is custodial when a person is "deprived of [her] freedom of action in any significant way" *(Miranda v Arizona,* 384 US 436, 444). In deciding whether a defendant is in custody, "[t]he test is not what the defendant thought, but rather what a reasonable [person], innocent of any crime, would have thought had [s]he been in the defendant's position" *(People v Yukl, supra,* at 589). While *People v Yukl (supra)* mandates an objective test, it does not oblige the courts to ignore the fact that a particular suspect is deaf. No test for ascertaining whether *Miranda* warnings are warranted can ignore an individual's inability to communicate with her interrogators. As the court observed in *People v Turkenich* (137 AD2d 363, 367), a suspect's "inability to speak or understand the language of [her] inquisitor" can render questioning inherently coercive and, hence, custodial. " '[E]ssential to a determination of whether a person, who has not actually been physically detained or formally placed under arrest, has been deprived of [her] freedom in any significant way so as to require the police to give the necessary warnings' " is an examination of the circumstances and the atmosphere in which the questioning takes place *(People v Paulin,* 33 AD2d 105, 110, *affd* 25 NY2d 445, quoting *People v Rodney P. [Anonymous],* 21 NY2d 1, 5-6).

Given the particular circumstances of the questioning here,

including the police-dominated atmosphere beginning at defendant's home *(see, Miranda v Arizona, supra,* at 445), defendant's status as a suspect from the time the investigation commenced *(cf., People v Centano, supra; People v Medvecky,* 95 AD2d 921, 922), a fact that was communicated to defendant by the nature of the police interrogation, the restraints on defendant's ability to move, and her isolation from and inability to communicate with her family and friends, we cannot say that County Court's determination that defendant was subjected to custodial interrogation at the hospital is unsupported by the evidence. First, within minutes of the arrival of the police, defendant fainted. Although no police officer accompanied defendant to the hospital, an. Assistant District Attorney made arrangements for the interpreters, who were sent to the hospital along with investigators to question defendant when she was sufficiently awake. Accordingly, defendant was in a police-dominated atmosphere from the time the police arrived at her home. Second, contrary to the assertion of the People, the questioning was not merely investigatory. Rather, the investigators, who had been advised from the beginning to treat defendant as the possible "shooter", compelled defendant to give them an account of her activities in the last 24 hours and, after she was done, made her repeat her story in detail. Defendant then became very emotional. She was described as "trembling, shaking and crying" by Jennifer Long and by Mulvey as "hysterical". At this point, Mulvey handed Goodall her notepad, stood up close to defendant, put her hand on defendant's arm and said "something like, it's okay". In response to this gesture, defendant allegedly stated, "I had to kill him."

Further, here, as in *People v Tanner* (31 AD2d 148, 150), "[i]t is quite obvious that restriction of movement by the police was not enforced because it was unnecessary * * * and the substitution of official custody for the restraint of circumstances could be effected at the pleasure of the police". Encumbered as she was by wires, tubes and needles, "[defendant] was, in short, 'at the complete mercy' of [the investigators], unable to escape or resist the thrust of [their] interrogation" *(Mincey v Arizona,* 437 US 385, 399, quoting *Beecher v Alabama,* 389 US 35, 38). Of even greater significance, because the investigators could hear and speak, they were able to dominate and control the situation in defendant's hospital room. Inasmuch as defendant was completely dependent upon the Longs and the investigators to mediate between her and

the hearing world, she was in the investigators' custody.* Indeed, the extent of the investigators' control over defendant is evidenced by the fact that the investigators, not defendant, obtained her discharge from the hospital. In sum, the finding that defendant's ability to move was restricted by her attachment to an electrocardiogram and intravenous feeding bottle, coupled with the fact that defendant was deaf and therefore isolated from and unable to communicate with her family and friends, provide support for County Court's conclusion that the police were required to advise defendant of her *Miranda* rights before interrogating her in the hospital room *(see, People v Turkenich,* 137 AD2d 363, *supra; People v Paulin,* 33 AD2d 105, *supra; People v Tanner, supra).*

In addressing the contentions of the majority, it must be noted that this case presents a unique and complex factual scenario. First, defendant, as the wife of the murder victim and present at the scene of the crime, was necessarily considered a prime suspect from the onset of the police investigation. Second, defendant was removed from her home in an unconscious state and awoke in a strange hospital room, connected to a monitor and intravenous apparatus, isolated from friends and family members and clearly unable to leave until authorized, and in fact assisted, by the police. Third, defendant was deaf, a significant limiting factor in itself, but further exacerbated by the conscious decision of the investigating police agency to utilize the services of demonstrably unqualified interpreters instead of an available certified legal interpreter. In a case such as this, it is all too simple to analyze and dismiss each of the separate factual components without a view to the others, as has the majority. However, County Court's determination that defendant was in custody from the onset of the police questioning was based upon a consideration of not one or two of these factors, but upon the complex interplay of all three. Neither undue stress upon the objective test propounded by *People v Yukl* (25 NY2d 585, 589, *supra)* nor any of the other legal authority supplied by the majority provides a basis for reversing County Court's order. Notably, not one of the "strikingly similar" cases presented by the majority deals with a defendant who is unable, for any reason, to communicate with his or her interrogators. In fact,

---

* Robert Johnson, defendant's expert, testified that the tendency of the deaf to rely upon those who can hear to mediate on the deaf person's behalf with the hearing world is known as "cultural brokering".

the majority barely recognizes that defendant could not hear or coherently communicate with her accusers, a factor which, objectively viewed, would inevitably engender a sense of isolation and despair.

MIKOLL, J. P., and LEVINE, JJ., concur with CREW III, J.; MERCURE, J., and YESAWICH JR., J., concur in part and dissent in part in a separate opinion by MERCURE, J.

Ordered that the order is modified, on the law and the facts, by reversing so much thereof as granted the motion and suppressed defendant's statements up to and including her assertion, "I had to kill him"; motion denied in that regard; and, as so modified affirmed.