OPINION OF THE COURT
David D. Egan, J.
This indictment accuses the defendant of murder in the second degree, attempted murder in the second degree, burglary in the first degree and kidnapping in the second degree. The charges arose out of an incident which occurred on January 5, 1995, during which defendant is alleged to have shot and killed his ex-wife’s husband and attempted to kill his ex-wife. It is further alleged that shortly after the shooting defendant drove to his former mother-in-law’s house and held her hostage at gunpoint for several hours. A police hostage negotiator was eventually able to persuade defendant to surrender peacefully. The novel question presented is whether defendant is entitled to suppression of the statements he made to the hostage negotiator because he was not given his Miranda warnings prior to making the statements.
A hearing was held and the court makes the following findings of fact and conclusions of law.
*667 FINDINGS OF FACT
On January 5, 1995, at approximately 4:15 p.m., Investigator Patrick Crough of the Monroe County Sheriffs Department responded to 84 Belvista Drive in Penfield, New York, to investigate a shooting which had occurred at that address. Crough walked to the front door of the residence and observed the body of a white male lying on the front foyer in a pool of blood. It was apparent that the man, later identified as Paul Henderson, had been shot several times.
At approximately 6:00 p.m., Crough was dispatched to 5001 Williamson Road in Wayne County. As Crough approached the area he was advised that defendant Enno Treier, a suspect in the Belvista Drive shooting, was holding Mary VerPlank, his former mother-in-law, hostage inside the residence. Crough, who was specially trained in hostage negotiations, set up a negotiation post at a residence near the VerPlank house. Crough then waited for the S.W.A.T. team to surround the VerPlank house.
At approximately 10:30 p.m., Crough attempted to make telephone contact with defendant. A woman answered the phone and identified herself as Mary. She confirmed that defendant had a loaded revolver, and was holding her hostage. Defendant initially refused to talk to Crough. Crough told Mary to convey to him that the police believed that the shooting was accidental. When Mary relayed the message defendant was heard to say "It was no accident. I would have shot Liz too, but she got away”.
A short time later, defendant agreed to talk to Crough on the telephone. Crough had a number of conversations with him during the course of the evening and into the early morning hours of the following day. Crough attempted to establish an atmosphere of trust between himself and the suspect. During his initial conversations with the suspect, Crough again suggested that the shooting may have been accidental. Again, the suspect responded that it was no accident; it was his intention to kill both of them.
In further conversations, Crough asked defendant if he had been drinking. Defendant responded that he had not had any alcohol prior to the shooting, but added that he had consumed a few beers at Mary’s house to calm his nerves. Crough asked him to stop drinking. Defendant agreed.
Crough later asked defendant how he felt about the shooting. Defendant replied, "I feel great, now I’ve got my self *668 respect back”. He explained that the shooting was a result of his wife’s unfaithfulness. He believed that his wife had an affair during the last eight years of their marriage. He recently learned that she had remarried. He felt that she had betrayed him.
On several occasions Crough asked the suspect to let Mary out of the house. He refused, expressing a willingness to shoot Mary if he had to. He demanded that his ex-wife be brought to the residence so that he could confront her in person. Crough told him that he could not meet that demand. After further negotiations, defendant agreed to accept a taped statement from his ex-wife confessing that the incident was entirely her fault. Police secured a taped statement from Mrs. Henderson. The suspect objected to the contents of the statement, demanding more information regarding how long she had known Paul Henderson and the date of their marriage. Police obtained another tape from Mrs. Henderson containing the demanded information. Defendant then allowed Mary VerPlank to leave the house. Defendant surrendered peacefully at 1:59 a.m. on January 6, 1995.
CONCLUSIONS OF LAW
It is now well established that the police must advise a person of his Miranda rights before conducting a custodial interrogation. (Miranda v Arizona, 384 US 436 [1966]; Berkemer v McCarty, 468 US 420 [1984].) To determine whether Miranda warnings are required in a given situation, a court must make two inquiries. First, it must determine whether the suspect was in custody. Second, it must determine whether the police interrogated the suspect. Neither the United States Supreme Court nor the New York State Court of Appeals has had the occasion to determine whether statements made by a suspect to a hostage negotiator constitute custodial interrogation for purposes of Miranda. The few lower courts which have considered the issue are divided. (See, State v Reimann, 19 Kan App 2d 431, 870 P2d 1346 [Kan App 1994]; Howard v Garvin, 844 F Supp 173 [SD NY 1994]; State v Pejsa, 75 Wash App 139, 876 P2d 963 [Wash App 1994]; State v Stearns, 178 Wis 2d 845, 506 NW2d 165 [Wis App 1993]; People v Manzella, 150 Misc 2d 956 [Sup Ct 1991]; State v Sands, 145 Ariz 269, 700 P2d 1369 [Ariz App 1985]; People v Gantz, 104 AD2d 692 [3d Dept 1984]; United States v Mesa, 638 F2d 582 [1980].)
*669 The initial question to be considered is whether defendant was in custody at the time he made the statements to the hostage negotiator. A suspect is in custody for Miranda purposes when there is a "formal arrest or restraint on freedom of movement” of the degree associated with a formal arrest. (Oregon v Mathiason, 429 US 492, 495 [1977]; see also, Berkemer v McCarty, supra.) Where, as here, there is no formal arrest, "the particular detention or restriction of movement must rise to the level of a de facto arrest before an individual will be deemed 'in custody’ for purposes of Miranda”. (People v Ripie, 182 AD2d 226, 230 [1992].) The test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant’s position. (People v Yukl, 25 NY2d 585, 589 [1969].) However, it is not enough that a reasonable person innocent of any crime would have felt that he or she was not free to leave or that his or her freedom of movement was restricted, a defendant will be said to be in custody only if the reasonable person innocent of any crime would have believed that he or she was under arrest at the time. (People v Ripic, supra, at 230-231.)
Here, defendant was barricaded in a house holding a hostage at gunpoint. Police were negotiating with him in an effort to persuade him to surrender. Defendant was aggressively resisting arrest by threatening the hostage and demanding that police bring his ex-wife to the house. Although the presence of the S.W.A.T. team may have restricted defendant’s freedom of movement and they would have attempted to prevent his leaving the area, it cannot be said that a reasonable person innocent of any crime would have believed that he or she was under arrest at that point. Accordingly, the court finds that defendant was not in custody at the time he made the statements to the hostage negotiator. (See, State v Pejsa, supra; State v Sands, supra; United States v Mesa, supra.)
The court finds as a matter of law that a defendant believed to be armed with a deadly weapon and holding a hostage inside a residence is not in police custody even though that residence is surrounded by armed police authorities.
The court also finds that the statements were not the product of police interrogation. (See, Rhode Is. v Innis, 446 US 291 [1980]; People v Ferro, 63 NY2d 316; State v Reimann, 19 Kan App 2d 431, 870 P2d 1346 [1994], supra; United States v Mesa, supra [Adams, J., concurring]; People v Gantz, 104 AD2d *670 692 [1984], supra.) In Rhode Is. v Innis (supra), the Supreme Court stated that the term interrogation under Miranda refers to "either express questioning or its functional equivalent.” (446 US, at 300-301, supra.) The Court, however, cautioned that "the definition of interrogation can extend only to words or actions on the part of the police officers that they should have known were reasonably likely to elicit an incriminating response” from the suspect. (Supra, at 302.) The Court noted that "the intent of the police * * * may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.” (Supra, at 301-302, n 7.)
In this case, it is clear that Deputy Crough’s intent was to encourage a peaceful resolution of the crisis, not to elicit information about the shootings. Accordingly, the court concludes that the statements were not the product of police interrogation.
Finally, the court concludes that the statements made by defendant to the hostage negotiator in this case fall within the purview of the public safety exception to the Miranda rule. (See, New York v Quarles, 467 US 649 [1984]; Howard v Garvin, supra; People v Manzella, supra.)
The public safety exception to the Miranda rule was recognized by the United States Supreme Court in New York v Quarles (supra, at 657-658) where the Court stated as follows: "We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege * * * We decline to place officers * * * in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings * * * or for them to give the warnings * * * but possibly damage or destroy their ability to * * * neutralize the volatile situation confronting them.”
In the present case, the officers arrived in the midst of a volatile situation. The suspect was holed up in a house with a hostage. One person was already dead. The suspect was distraught, drinking, armed with a gun and threatening to shoot the hostage if his demands were not met. The suspect presented a very real and immediate threat to the public safety.
The statements made by Crough during the negotiations were supportive and designed to establish a relationship of *671 trust. Advisement of the Miranda warnings may have aggravated the situation and frustrated Crough’s efforts to secure the safe release of the hostage. Under these circumstances, the warnings were not required.
For the reasons stated above, defendant’s motion to suppress the statements made by defendant to the hostage negotiator is denied in all respects.